OPINION
{¶ 1} Appellant-appellant, Northfield Park Associates ("Northfield"), appeals from a judgment of the Franklin County Court of Common Pleas affirming the orders of appellee-appellee, Ohio State Racing Commission ("Racing Commission"), granting Thistledown, Inc.'s requests to engage in the simulcasting of horse races from particular racetracks. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} The Racing Commission regulates horse racing in Ohio and the parimutuel system of wagering[1] thereon. See R.C. Chapter 3769. Thistledown operates a thoroughbred horse racetrack in Cleveland, Ohio, and Northfield operates a standardbred horse racetrack in Northfield, Ohio. It is undisputed that both Thistledown and Northfield hold permits to conduct horse races and parimutuel wagering on horse races.
 {¶ 3} This appeal arises from requests made to the Racing Commission by Thistledown to simulcast certain horse racing programs. In a letter dated July 15, 2004, Thistledown requested approval to simulcast certain horse racing programs "commencing July 26, 2004." In response to that request, the Racing Commission held hearings on July 23 and August 10, 2004. On August 13, 2004, the Racing Commission issued a finding and order addressing Thistledown's July 15, 2004 request. The order authorized Thistledown to carry simulcast signals from certain racetracks, but denied Thistledown's request to carry simulcast signals from certain other racetracks.
 {¶ 4} Subsequently, at a meeting held on August 19, 2004, the Racing Commission discussed Thistledown's request to simulcast signals from particular tracks in September 2004. On August 26, 2004, the Racing Commission issued a finding and order that approved Thistledown's request as to certain racetracks but denied the request as to certain other racetracks. The order, in part, states:
[T]he Commission denies the request of Thistledown the thirteen tracks that they requested and which were denied approval in the month of August; and that approval be given to the request of Thistledown for the racetracks that begin with a video feed that is at least 90 minutes prior to the 4:00 p.m. post time, which would be * * *."
 {¶ 5} On August 27, 2004, and pursuant to R.C. 119.12, Northfield appealed to the Franklin County Court of Common Pleas from the Racing Commission's August 13 and August 26, 2004 Findings and Orders. Northfield moved the trial court for a stay of the Racing Commission's orders. On August 30, 2004, the Racing Commission issued an amended finding and order, approving the request of Thistledown as to certain simulcast racing programs "that begin with a video feed that is no more than 90 minutes prior to the post time of the first race[.]" Northfield appealed from this amended finding and order, and the trial court consolidated the administrative appeals. Thistledown, the Ohio Harness Horsemen's Association ("OHHA"), the Ohio Thoroughbred Owners and Breeders Association ("OTOBA"), and the Horsemen's Benevolent and Protective Association, Ohio Division, Inc. ("OHBPA"), sought to intervene, and the trial court granted their motions. On October 6, 2004, the trial court denied Northfield's motion to stay.
 {¶ 6} On October 27, 2004, Northfield filed a motion in the trial court seeking the admission of additional evidence, namely, the testimony of C. Luther Heckman. Northfield attached an affidavit of Mr. Heckman to its motion. In December 2004, the trial court denied Northfield's motion to admit the additional evidence. Subsequently, on January 13, 2005, Northfield proffered a different affidavit of Mr. Heckman as being a statement of what his testimony would have been had the trial court permitted him to testify. Thistledown, OHBPA, and OTOBA moved to strike Northfield's proffer of evidence. On February 7, 2005, the trial court issued a decision as to the motion to strike the proffer of evidence. In said decision, the trial court noted that it would not consider the affidavit, but overruled the motion to strike on the basis that nothing precludes Northfield from preserving the offer for later review.
 {¶ 7} The matter was referred to a magistrate, who issued a decision on April 22, 2005. In the decision, the magistrate determined that the commission's order was supported by reliable, probative, and substantial evidence, and was in accordance with law. Northfield and OHHA filed objections to the magistrate's decision. The trial court issued a decision denying Northfield's and OHHA's objections and adopting the magistrate's April 22, 2005 decision. The trial court entered final judgment on June 29, 2005.
 {¶ 8} Northfield appeals and has set forth the following two assignments of error:
I. The adoption by the Ohio State Racing Commission (the "OSRC") of a new rule defining when a simulcast racing program commences, and the inconsistent application of that rule, are contrary to law.
II. The Franklin County Court of Common Pleas erroneously denied Appellant Northfield Park Associates' ("Northfield") motion to admit additional evidence to be introduced by C. Luther Heckman, the Chairman of the OSRC from 1995 until February of 2004.
 {¶ 9} Curiously, Northfield's first assignment of error does not allege any prejudicial error committed by the trial court. The assignment of error alleges that the Racing Commission acted contrary to law by adopting a new rule defining when a simulcast racing program commences, and by inconsistently applying that rule. Nonetheless, we construe Northfield's first assignment of error as arguing that the trial court erred in affirming the orders of the Racing Commission relating to Thistledown's simulcast racing program requests.
 {¶ 10} Pursuant to R.C. 119.12, when a common pleas court reviews an order of an administrative agency, it must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. Univ. of Cincinnati v. Conrad (1980),63 Ohio St.2d 108, 110-111; see, also, Andrews v. Bd. of LiquorControl (1955), 164 Ohio St. 275, 280.
 {¶ 11} The common pleas court's "review of the administrative record is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court `must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.'"Lies v. Ohio Veterinary Med. Bd. (1981), 2 Ohio App.3d 204,207, quoting Andrews, at 280.
 {¶ 12} An appellate court's review of an administrative decision is more limited than that of a common pleas court. Ponsv. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621, rehearing denied, 67 Ohio St.3d 1439. In Pons, the Supreme Court of Ohio instructed:
* * * While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion, i.e., being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for [that of an administrative agency] or a trial court. Instead, the appellate court must affirm the trial court's judgment. * * *
Id. at 621.
 {¶ 13} An appellate court does, however, have plenary review of purely legal questions. Steinfels v. Ohio Dept. of Commerce,Div. of Securities (1998), 129 Ohio App.3d 800, 803, appeal not allowed (1999), 84 Ohio St.3d 1488.
 {¶ 14} The issues in this appeal revolve around R.C.3769.089(D), which was enacted by Sub.H.B. 561 on May 29, 1996, and became effective on September 19, 1996. R.C. 3769.089(D) provides, in part, as follows:
If a simulcast host is conducting a racing program that features thoroughbred or quarter horses on the same day that another simulcast host is conducting a live racing program that features harness horses at a track located in the same county as, or within twenty miles of, the track of the first simulcast host, the first simulcast host shall not conduct pari-mutuel wagering on simulcast racing programs that commence after four p.m. on that day and the second simulcast host shall not conduct wagering on simulcast racing programs that commence before three p.m. on that day.
(Emphasis added.)
 {¶ 15} In the case at bar, it is undisputed that Thistledown, which operates a thoroughbred horse racetrack in Cleveland, conducts races during the day, and Northfield, which operates a standardbred horse racetrack in Northfield, Ohio, conducts races during the evening. Additionally, the tracks at Thistledown and Northfield are within 20 miles of each other. Thus, applying R.C.3769.089(D) to Thistledown and Northfield, "when Thistledown and Northfield are conducting live racing programs on the same day, then, on such days, Thistledown may not offer wagering on simulcast racing programs that `commence' after 4:00 p.m., and Northfield may not offer wagering on simulcast racing programs that `commence' before 3:00 p.m." (Northfield's merit brief, at 3.) The parties in this appeal disagree as to when a "simulcast racing program * * * commence[s]" for purposes of R.C.3769.089(D).
 {¶ 16} "Simulcast racing program" is statutorily defined. R.C. 3769.089(A)(6) provides as follows:
"Simulcast racing program" means all simulcasts of horse races to a simulcast host or simulcast guest on a racing day or on any other day on which pari-mutuel wagering is conducted, but does not include any simulcast horse races from inside or outside the state that are included in a simulcast host's live racing program.
Ohio Adm. Code 3769-1-42 and 3769-11-50 both define "simulcast" as "the telecast, for wagering purposes, of audio and visual signals of live horse races conducted at facilities either inside or outside the state of Ohio." "Race" is defined as "a contest of speed for a purse, stakes, premium, wager of money, or for admission fees, on any course[.]" Ohio Adm. Code 3769-1-20. See, also, Ohio Adm. Code 3769-11-17 (providing essentially the same definition for "race"). "Commence" is not legislatively defined for purposes of R.C. 3769.089(D).
 {¶ 17} Resolution of this appeal requires an assessment of whether the Racing Commission properly applied and/or interpreted R.C. 3769.089(D) when it adjudicated Thistledown's simulcast racing program requests. "The primary duty of a court in construing a statute is to give effect to the intention of the Legislature enacting it. In determining that intention, a court should consider the language used and the apparent purpose to be accomplished, and then such construction should be adopted which permits the statute and its various parts to be construed as a whole and gives effect to the paramount object to be attained."Humphrys v. Winous Co. (1956), 165 Ohio St. 45, 49, citingCochrel v. Robinson (1925), 113 Ohio St. 526. R.C. 1.42
provides: "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Additionally, R.C. 1.47 states as follows:
In enacting a statute, it is presumed that:
(A) Compliance with the constitutions of the state and of the United States is intended;
(B) The entire statute is intended to be effective;
(C) A just and reasonable result is intended;
(D) A result feasible of execution is intended.
 {¶ 18} "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." Sears v.Weimer (1944), 143 Ohio St. 312, paragraph five of the syllabus. However, "[i]t is firmly established that a statute is ambiguous when its language is subject to more than one reasonable interpretation." Family Medicine Found., Inc. v. Bright,96 Ohio St.3d 183, 2002-Ohio-4034, at ¶ 8. "It is only where the words of a statute are ambiguous or are based upon an uncertain meaning or there is an apparent conflict of some provisions that a court has the right to interpret a statute." Drake-Lassie v.State Farm Ins. Cos. (1998), 129 Ohio App.3d 781, 788, citingKroff v. Amrhein (1916), 94 Ohio St. 282, and R.C. 1.49. If a statute is ambiguous, the court, in determining legislative intent, may consider among other matters:
(A) The object sought to be attained;
(B) The circumstances under which the statute was enacted;
(C) The legislative history;
(D) The common law or former statutory provisions, including laws upon the same or similar subjects;
(E) The consequences of a particular construction;
(F) The administrative construction of the statute.
R.C. 1.49.
 {¶ 19} Regarding an administrative agency's interpretation of a statute, this court has stated, "We agree that a trial court ordinarily should defer to an administrative agency's interpretation of a statute it must administer. * * * To be afforded that deference, however, the agency's interpretation must be reasonable and consistent with the underlying legislative intent." Schroeder v. State Bd. of Registration for Prof.Engineers Surveyors, Franklin App. No. 04AP-338,2004-Ohio-5793, at ¶ 12 (citations omitted). Moreover, the Supreme Court of Ohio has stated that "[i]t is a fundamental tenet of administrative law that an agency's interpretation of a statute that it has the duty to enforce will not be overturned unless the interpretation is unreasonable." State ex rel. Clarkv. Great Lakes Construction Co., 99 Ohio St.3d 320,2003-Ohio-3802, at ¶ 10. "Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." Weiss v. Pub. Util.Comm. (2000), 90 Ohio St.3d 15, 17-18, citing Collinsworth v.W. Elec. Co. (1992), 63 Ohio St.3d 268, 272.
 {¶ 20} As to the issue of the Racing Commission's interpretation and application of R.C. 3769.089(D) in this matter, we initially address Northfield's assertion that the Racing Commission has "reversed" the "historical precedent." Specifically, Northfield asserts that a "historical precedent" was established by the Racing Commission and the parties, whereby it was the practice that a simulcast racing program commences at the post time of the first race on the program. According to Thistledown, the Racing Commission previously had not addressed the proper interpretation of R.C. 3769.089(D), and this case was the first instance in which the Racing Commission specifically addressed this issue.
 {¶ 21} Northfield notes that it argued at the August 10, 2004 hearing that the question of when a simulcast racing program commences had "been before the Commission every month since September of 1996" because the Racing Commission "must and has approved the simulcast racing programs offered by simulcast hosts," and that "each month the permit holders * * * have used post times as the basis for the makeup of the simulcast racing programs for afternoon and evening hosts." (August 10, 2004 hearing Tr., at 52.)
 {¶ 22} In discussing whether the issue previously had been addressed, Commissioner Norman Barron, at the July 23, 2004 hearing, stated, "I think you're correct in that it's never been before the Commission. I don't think any permit holder, Thistledown, in particular, has ever requested anything like this. On the other hand, I think Commissioner Zaino's point is very well taken. We have a historical precedent, whether it was by default or otherwise, which has created a portion of an economic plan that a permit holder has." (Id. at 20-21.)
 {¶ 23} Additionally, Northfield argues that the terms of an agreement between it and Thistledown confirm their understanding that a simulcast racing program commences at the post time of the first race. In support, Northfield cites the affidavit of Thomas M. Aldrich, the Executive Vice President and Chief Operating Officer of Northfield, indicating that Thistledown and Northfield entered into an agreement pursuant to R.C. 3769.089(K)(1), a "K(1) agreement." R.C. 3769.089(K)(1) provides as follows:
Permit holders operating tracks within the same county or adjacent counties that are conducting simulcast racing programs under this section may enter into agreements regarding the conduct of simulcast racing programs at their respective tracks and the sharing of the retained commissions therefrom, for such periods of time, upon such terms and conditions, and subject to such rights and obligations, as the contracting permit holders consider appropriate under the circumstances. Permit holders so contracting shall notify the state racing commission of their entry into an agreement pursuant to this division, the names of the permit holders that are parties to the agreement, and the length of the term of the agreement.
 {¶ 24} Under the agreement, covering the period beginning May 3, 2004 and ending June 14, 2004, Thistledown was permitted to simulcast certain racing programs from Bay Meadows where the post time of the first race was after 4 p.m. and Northfield was permitted to simulcast certain racing programs from Churchill Downs and Arlington Park where the post time of the first race was on or before 3 p.m.
 {¶ 25} According to Northfield, that agreement demonstrated Thistledown's "undeniable understanding that a simulcast racing program commences at the post time of the first race on the program." (Northfield's merit brief, 5-6.) Indeed, the parties to that agreement seemingly proceeded under the assumption that, under R.C. 3769.089(D), a simulcast racing program commences at the post time of the first race on the program. However, that understanding at the time did not somehow preclude Thistledown from subsequently seeking an alternative interpretation of that statute by the Racing Commission.
 {¶ 26} In its June 20, 2005 decision, at 6-7, the trial court determined that "[i]n the present case, the Commission had never previously made a formal construction of the statute." We concur with the trial court and find that the record demonstrates that the Racing Commission had not, prior to this case, formally construed R.C. 3769.089(D) as it relates to the underlying disputed issue in this matter.
 {¶ 27} In this appeal, Northfield specifically contends that the Racing Commission created a "90 Minute Rule" when, in its August 30, 2004 order, it approved Thistledown's request for September simulcast racing programs, but only for those simulcast racing programs "that begin with a video feed that is no more than 90 minutes prior to the post time of the first race." (See Northfield's merit brief, at 8, quoting Aug. 30, 2004 order.) Essentially, in resolving the dispute relating to Thistledown's simulcast racing program requests, the Racing Commission determined that, for purposes of R.C. 3769.089(D), a simulcast racing program commences when the signal of the video feed on the simulcast racing program begins, as long as the video feed is no more than 90 minutes prior to the post time of the first race. Northfield argues that the Racing Commission's interpretation of R.C. 3769.089(D) is contrary to law because it is neither reasonable nor consistent with the underlying legislative intent.
 {¶ 28} In its merit brief, Northfield sets forth a detailed textual analysis of the legislative scheme at issue in this case and arrives at the conclusion that a simulcast racing program commences at the post time of the first race on the program.
 {¶ 29} Northfield recognizes that because "commence" has not been given a special meaning for purposes of the legislative scheme at issue in this case, its normal and customary meaning must be applied. See R.C. 1.42. The verb "commence" means to begin or to start. Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) 249. Northfield further observes that, in view of R.C.3769.089(A)(6) and Ohio Adm. Code 3769-1-42 and 3769-11-50, a simulcast racing program "is a set or collection of simulcasts of horse races, and a simulcast is a telecast for wagering purposes." (Northfield's merit brief, at 26.)
 {¶ 30} Therefore, the issue becomes when does the telecast of the first race on the program begin or start? Northfield argues that the telecast of the first race on the program commences with the race itself and does not include any pre-race activities. In support of that argument, Northfield points to the language in Ohio Adm. Code 3769-1-42 and 3769-11-50 defining "simulcast" as the "telecast, for wagering purposes, of audio and visual signals of live horse races," and notes that the rules do not state "thetelecast, for wagering purposes, of audio and visual signals of live horse races and the activities that precede those races." (Id. at 27; emphasis sic.) Thus, Northfield reasons that the telecast of the first race begins with the start of the first race itself and does not include any pre-race activities.
 {¶ 31} If Northfield's analysis is followed to its logical conclusion, then a simulcast racing program commences at the moment the doors of the starting gate open for the first race on the program. However, Northfield observes that the moment that the doors of the starting gate open "typically lags behind the published post time" for an unpredictable duration in view of "the practical difficulties in getting horses lined up and into the starting gate." (Id. at 28.) Therefore, it is not feasible to view the moment the doors of the starting gate open for the first race as when a simulcast racing program commences for purposes of R.C. 3769.089(D). Consequently, Northfield applies R.C. 1.47(D) to resolve that a horse race's "post time," or the "scheduled starting time of the horse race," is a more appropriate and feasible point at which to consider when the first race commences. (See id.) Thus, Northfield concludes that a simulcast racing program commences at the post time of the first race on the program.
 {¶ 32} Northfield reaches this conclusion even though, under that interpretation, any pre-race activity that occurs between the scheduled post time and the moment the doors of the starting gate open are included in the telecast. As noted by Northfield, the moment the doors of the starting gate open "typically lags behind the published post time." (Id.) It is arguable that Northfield's application of R.C. 1.47(D) analytically conflicts with its reasoning as to why pre-race activities for the first race are not part of the telecast.
 {¶ 33} Moreover, Northfield reaches this conclusion even though it seems to concede that inter-race activities are part of the simulcast racing program. In its discussion relating to the temporal restrictions of R.C. 3769.089(D), Northfield states that "simulcast racing programs typically vary in length from four to four and one-half hours." (Id. at 17.) Implicit in that assertion is the understanding that a simulcast racing program consists of the transmitted video and audio signals of activities occurring between the races, which could be alternatively characterized as pre- and post-race transmissions.
 {¶ 34} Although Northfield's interpretation of R.C.3769.089(D) is arguably reasonable, our review of the language of the legislative scheme at issue in this case reveals that it is unclear as to when a simulcast racing program commences for purposes of R.C. 3769.089(D). That is, R.C. 3769.089(D) is ambiguous insofar as it does not specify when a simulcast racing program commences. The statute is reasonably susceptible to more than one interpretation because it is unclear whether the simulcast racing program commences with the start of the first race, or commences with the start of the transmission of the video feed. Northfield's interpretation of the statute focuses on when the first race on the program begins, and the Racing Commission's interpretation focuses on when the video feed begins.
 {¶ 35} Whether one's interpretation focuses on the start of the race itself or on the start of the video feed, there are consequences relating to the feasibility of operation or reasonableness of result. As discussed by Northfield, viewing the moment the doors of the starting gate open for the first race as when a simulcast racing program commences is not feasible considering the practicalities of horse racing. Similarly, viewing the start of the transmission of the video feed as when a simulcast racing program commences, regardless of the length of time between the initial transmission of the video feed and the scheduled start of the first race, would seem unreasonable. In that regard, the Racing Commission's interpretation of the statute addresses the defect in that construction. As discussed above, the Racing Commission essentially determined that, for purposes of R.C. 3769.089(D), a simulcast racing program commences when the signal of the video feed on the simulcast racing program begins, as long as the video feed is no more than 90 minutes prior to the post time of the first race.
 {¶ 36} It is reasonable that substantive information relating to a simulcast racing program typically begins no more than 90 minutes prior to the post time of the first race, as opposed to, for example, no more than 60 minutes, or no more than 30 minutes. Additionally, Thistledown's Exhibit C, which was presented at the Racing Commission hearing, supports the Racing Commission's construction of the statute. That exhibit provided a frame of reference as to when video and audio signals begin in relation to the scheduled post times at particular racetracks. Although Thistledown's Exhibit C does not instruct a particular interpretation of R.C. 3769.089(D), it does support the reasonableness of the Racing Commission's interpretation of that statute, as it relates to Thistledown's simulcast racing program requests.
 {¶ 37} Considering the foregoing, we cannot conclude that the Racing Commission's interpretation of R.C. 3769.089(D) is unreasonable.
 {¶ 38} We next address Northfield's argument that the Racing Commission's interpretation of R.C. 3769.089(D) conflicts with the underlying legislative intent. Northfield specifically contends that the affidavit of Mr. Aldrich, and the joint affidavit of Thomas Journell and John D. Stanley, provide testimony as to the circumstances under which R.C. 3769.089(D) was enacted. Northfield asserts that those affidavits support the conclusion that it was the intention of the legislature that a simulcast racing program commences at the post time of the program's first race.
 {¶ 39} Mr. Aldrich testified that, in the winter of 1995, the "Ohio's Horse Industry Survival Coalition" ("Survival Coalition") was formed by OHBPA, OHHA, Buckeye Turf Club, Inc., Lebanon Trotting Club, Scioto Downs, Inc., Raceway Park, Inc., River Downs Turf Club, Northfield, and Thistledown. "The purpose of the Survival Coalition was to develop legislation and industry consensus regarding simulcast racing, and wagering thereon, at race tracks and satellite facilities in Ohio." (August 5, 2004 Affidavit of Aldrich, at paragraph four.) The Survival Coalition members agreed to form a "Negotiating Committee" for the purpose of "negotiating policy issues and drafting simulcast racing legislation." (Id.) The negotiating committee consisted of Mr. Journell (then Executive Director of OHBPA), Mr. Stanley (then General Manager of OHHA), Michael Mackey (then Vice President and General Manager of Thistledown), and Mr. Aldrich (then General Manager of Northfield Park Associates). C. Luther Heckman and Clifford A. Nelson, respectively Chairman and Executive Director of the Racing Commission, "monitored and facilitated sessions of the Negotiating Committee." (Id.)
 {¶ 40} According to Mr. Aldrich's affidavit, it was the "understanding, intention and agreement of the Negotiating Committee, members of the Survival Committee and other interested parties, including the Commission, that the commencement of a simulcast racing program would be determined by the post time,i.e., the scheduled starting time of the first race on the simulcast racing program as published by the track conducting the live races." (Id. at paragraph seven.)
 {¶ 41} The joint affidavit of Messrs. Journell and Stanley was also submitted at the Racing Commission hearing. Said affidavit also discussed the formation of the survival coalition and the negotiating committee, as well as the intention of the interested parties regarding when a simulcast racing program should be considered to commence.
 {¶ 42} Although the affidavits may indicate the reasonable perception of interested parties relating to the enactment of Sub.H.B. 561, they do not necessarily demonstrate the intention of the General Assembly with respect to R.C. 3769.089(D), an ambiguous statute. Thus, Northfield's submission of the affidavits of Messrs. Aldrich, Journell, and Stanley did not require the application of the interpretation of R.C. 3769.089(D) that Northfield advocated.
 {¶ 43} Northfield argues that the Racing Commission's interpretation of R.C. 3769.089(D) "destroys the competitive balance between live and simulcast racing programs." (Northfield merit brief, at 16.) In support of this argument, Northfield has provided, in its appellate merit brief, timelines that demonstrate the temporal consequences of the Racing Commission's interpretation of R.C. 3769.089(D). Clearly, the Racing Commission's interpretation of R.C. 3769.089(D) is more advantageous to Thistledown than Northfield's interpretation of that statute.
 {¶ 44} Under the Racing Commission's interpretation, Thistledown may conduct wagering on simulcast racing programs even when the post time of the first race on the program is after 4 p.m. Northfield, which, under certain circumstances, is precluded from conducting wagering on simulcast racing programs that commence before 3 p.m., would not benefit as Thistledown from the Racing Commission's interpretation. However, that circumstance does not necessarily demonstrate that Northfield's interpretation establishes economic equity, or that the Racing Commission's interpretation is unreasonable. In other words, although Northfield is correct that there are consequences to interpreting R.C. 3769.089(D) one way versus another, it has not demonstrated that the Racing Commission's interpretation disrupts economic equities so as to subvert the intention of the legislature.
 {¶ 45} Considering the foregoing, we can only conclude that the Racing Commission's interpretation of R.C. 3769.089(D) is not unreasonable or inconsistent with the underlying legislative intent.
 {¶ 46} Under its first assignment of error, Northfield also argues that the Racing Commission does not "consistently apply the 90 Minute Rule." (Northfield's merit brief, at 21.) According to Northfield, the Racing Commission's "inconsistent" application of R.C. 3769.089(D) violates equal protection under theFourteenth Amendment to the United States Constitution and Section 2, Article I of the Ohio Constitution. Northfield does not challenge R.C. 3769.089(D) as being unconstitutional on its face; instead, Northfield argues that the statute has been unconstitutionally applied by the Racing Commission.
 {¶ 47} "The limitations placed upon governmental action by the federal and state Equal Protection Clauses are essentially the same." McCrone v. Bank One Corp., 107 Ohio St.3d 272,2005-Ohio-6505, at ¶ 7. "The guarantee of equal protection of the laws means that `no person or class of persons shall be denied the same protection of the law which is enjoyed by other persons or other classes in the same place and under like circumstances.'" Cahill v. Lewisburg (1992),79 Ohio App.3d 109, 115, quoting State v. Gledhill (1984), 13 Ohio App.3d 372,373.
 {¶ 48} Northfield seems to argue that, in view of the Racing Commission's interpretation of R.C. 3769.089(D) that it applied in the resolution of Thistledown's disputed requests, it has been denied equal protection because the Racing Commission has not applied that interpretation to its uncontested simulcast racing program requests. Northfield's equal protection argument is flawed because Northfield cannot demonstrate that it has been adversely affected by the Racing Commission's apparent approval of its simulcast racing program requests. Nothing in the record indicates that Northfield has been denied the opportunity to simulcast racing programs that it has requested or that Thistledown has challenged such requests. Considering the foregoing, we find Northfield's equal protection argument to be unpersuasive.
 {¶ 49} Additionally, Northfield argues under its first assignment of error that the Racing Commission's actions violate the Administrative Procedures Act (R.C. Chapter 119). Specifically, Northfield argues that the Racing Commission did not comply with the requirements of R.C. 119.03 when it promulgated what Northfield characterizes as the "90 Minute Rule."
 {¶ 50} R.C. 119.01(C) defines a "rule" as "any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency, and includes any appendix to a rule." R.C. 119.01(C). A rule "does not include any internal management rule of an agency unless the internal management rule affects private rights and does not include any guideline adopted pursuant to section 3301.0714 of the Revised Code." Id. R.C. 119.01(D) defines "adjudication" as "the determination by the highest or ultimate authority of an agency of the rights, duties, privileges, benefits, or legal relationships of a specified person, but does not include * * * acts of a ministerial nature." R.C. 119.03 sets forth certain procedures that an agency must comply with in order to adopt, amend, or rescind any rule.
 {¶ 51} The Racing Commission, in resolving the underlying dispute in this case, determined that, for purposes of R.C.3769.089(D), a simulcast racing program commences with a video feed that is no more than 90 minutes prior to the post time of the first race. In essence, the Racing Commission adjudicated competing interpretations of R.C. 3769.089(D) in resolving the dispute relating to Thistledown's simulcast racing program requests. Considering the circumstances of this case, we find that the Racing Commission did not improperly adopt, promulgate, and enforce a rule. Therefore, we conclude that the Racing Commission did not violate the requirements of R.C. 119.03.
 {¶ 52} Based on the foregoing, we conclude that the Racing Commission did not act contrary to law in its application of R.C.3769.089(D) to Thistledown's simulcasting requests, and the trial court did not err in affirming the orders relating to those requests. Accordingly, we overrule Northfield's first assignment of error.
 {¶ 53} By its second assignment of error, Northfield argues that the trial court erred in denying its motion to admit additional evidence. Northfield contends that the evidence sought to be introduced would have been dispositive of several issues and should have been admitted by the trial court. In its appellate merit brief, Northfield argues the relevance and significance of the additional evidence in an attempt to show prejudice by the trial court's decision.
 {¶ 54} On October 27, 2004, Northfield moved the trial court to admit additional evidence to be introduced by Mr. Heckman. Northfield attached an October 26, 2004 affidavit of Mr. Heckman to its motion to admit additional evidence. In its motion, Northfield stated that the additional evidence would specifically address two important issues in the appeal to the trial court. Namely, according to Northfield, Mr. Heckman would address the background of Sub.H.B. 561, and he would explain the circumstances under which the Racing Commission previously had determined that a simulcast racing program commences at the post time of the first simulcast race.
 {¶ 55} Under R.C. 119.12, "the court is confined to the record as certified to it by the agency" unless otherwise provided by law. Furthermore, R.C. 119.12 provides, in pertinent part, as follows: "Unless otherwise provided by law, the court may grant a request for the admission of additional evidence when satisfied that such additional evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the agency."
 {¶ 56} Northfield argues that this court's review of the trial court's denial of its motion to admit additional evidence is de novo. In Cincinnati City School District v. State Bd. ofEdn. (1996), 113 Ohio App.3d 305, 317, this court stated: "The decision to admit additional evidence lies within the discretion of the court of common pleas, but only after the court has determined that the evidence is newly discovered and that it could not with reasonable diligence have been ascertained prior to the agency hearing." Northfield contends that the trial court's discretion to deny the motion did not arise because it had determined that the two legal requirements for admissibility were not established. According to Northfield, the discretion of the trial court only arises after it determines that the evidence is newly discovered and that it could not with reasonable diligence have been ascertained prior to the agency hearing. Northfield reasons that because the trial court determined that these requirements were not established, then the trial court's discretion did not legally arise. Therefore, pursuant to Northfield's reasoning, our review of the trial court's denial of the motion to admit additional evidence is de novo.
 {¶ 57} Certainly, pursuant to R.C. 119.12, the trial court has no discretion to admit additional evidence if it is not satisfied that the evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the agency. It is equally certain that the trial court possesses discretion in deciding whether to admit additional evidence in an appeal from an administrative proceeding pursuant to R.C. 119.12. See, e.g., Daniels Buick Co.v. General Motors Corp. (Oct. 13, 1998), Franklin App. No. 97APE12-1701. Thus, we must review the trial court's denial of Northfield's motion to admit additional evidence under an abuse of discretion standard. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 58} In this case, the trial court expressly declined to exercise its discretion to admit additional evidence. The trial court determined that the evidence Northfield sought to introduce was not "newly discovered," and Northfield failed to demonstrate "reasonable diligence" in seeking the evidence. The trial court observed that Mr. Heckman's reluctance to testify at the Racing Commission hearings and his subsequent willingness to testify did not make his testimony "newly discovered" evidence. Additionally, the trial court, noting Northfield's decision not to seek a subpoena for Mr. Heckman's testimony, found that Northfield failed to demonstrate "reasonable diligence" in seeking to obtain Mr. Heckman's testimony at the hearings. Moreover, the trial court stated that the asserted relevance and importance of Mr. Heckman's testimony does not meet the requirements of R.C.119.12.
 {¶ 59} Northfield argues that the requirements set forth in R.C. 119.12 for the introduction of additional evidence were satisfied. According to Northfield, Mr. Heckman's testimony is admissible newly discovered evidence because it pertains to facts that occurred prior to the Racing Commission hearings. In GoldenChristian Academy v. Zelman (2001), 144 Ohio App.3d 513, 517, this court stated that "[n]ewly discovered evidence is evidence that was in existence at the time of the administrative hearing." Additionally, this court explained that "[n]ewly discovered evidence does not refer to newly created evidence." Id.
 {¶ 60} In addition, Northfield argues that it exercised reasonable diligence. First, Northfield states that it interviewed Mr. Heckman before the August 10, 2004 hearing, that he provided only limited, general information, and that he declined to provide an affidavit or testify before the Racing Commission. Second, Northfield states that, at the August 10, 2004 hearing, it proposed that the Racing Commission "invite" Mr. Heckman to testify, but the Racing Commission declined. Third, Northfield states that Mr. Heckman provided specific information to Northfield, which was inconsistent with the record, after the Racing Commission hearings. Fourth, Northfield claims that until Mr. Heckman "volunteered to correct the record, [it] had no reason to believe that he was privy to any information regarding Thistledown's repeated requests that the OSRC address when a simulcast racing program commences." (Northfield's merit brief, at 37.)
 {¶ 61} Mr. Heckman was appointed as a member of the Racing Commission in 1993, and served as its chairman from 1995 until February of 2004. According to Mr. Heckman's October 26, 2004 affidavit, representatives of Northfield requested that he "testify or prepare an affidavit for presentation before the OSRC regarding the origins of Sub. H.B. 561 and [his] experiences as Chairman of the OSRC in the application of the provisions of that legislation." Mr. Heckman declined the request "out of deference to and respect for the new Chairman of the OSRC, Scott Borgemenke." (Id.)
 {¶ 62} Although Northfield might not have known precisely what Mr. Heckman's testimony would have been, it understood that he might have had specific knowledge regarding potentially significant information regarding certain issues. Otherwise, it would not have asked him to testify or provide an affidavit as to those issues.
 {¶ 63} Moreover, although Northfield proposed that the Racing Commission invite Mr. Heckman to testify, it did not make a request to the Racing Commission that it subpoena Mr. Heckman. Under R.C. 119.09, if requested by a party to the adjudicatory hearing, an administrative agency must issue a subpoena to compel the attendance of a witness. See, e.g., Carratola v. Ohio StateDental Bd. (May 6, 1998), Summit App. No. 18658. Had Northfield made such a request as to Mr. Heckman, then the Racing Commission, under R.C. 119.09, would have been required to subpoena Mr. Heckman to appear at the administrative hearing. Thus, Northfield could have acted before the administrative hearing and secured Mr. Heckman's appearance at the hearing.
 {¶ 64} Upon our review of the record, we conclude that the trial court did not abuse its discretion in denying Northfield's motion to admit additional evidence. Accordingly, Northfield's second assignment of error is overruled.
 {¶ 65} Having overruled both of Northfield's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Klatt, P.J., and McGrath, J., concur.
[1] Black's Law Dictionary defines "parimutuel betting" as "[a] system of gambling in which bets placed on a race are pooled and then paid (less a management fee and taxes) to those holding winning tickets." Black's Law Dictionary (7th Ed. 1999) 1138.