OPINION
{¶ 1} Defendants-appellants, Ohio Secretary of State J. Kenneth Blackwell (the "Secretary") and Ohio Assistant Secretary of State Monty Lobb (collectively referred to as "appellants"), appeal from the judgment of the Franklin County Court of Common Pleas, which granted the motion for preliminary injunction filed by plaintiffs-appellees, Lloyd C. Mahaffey, James W. Harris, Sarah Ogdahl, and Stephen E. Mindzak ("appellees"). For the following reasons, we reverse.
 {¶ 2} In March 2006, the General Assembly passed, and the Governor signed, S.B. 7, which made changes to workers' compensation laws in Ohio. On June 29, 2006, one day before the effective date of S.B. 7, appellees filed a referendum petition with the office of the Secretary, seeking to place a referendum against the enactment of a portion of S.B. 7 before Ohio voters on the November 7, 2006 ballot.
 {¶ 3} The Secretary forwarded the part-petitions of the referendum petition to the county boards of elections to verify that the signatures contained in the part-petitions were valid. The reports of the boards indicated that some of the signatures submitted were not valid.
 {¶ 4} Appellees filed protest actions against the boards' actions in 11 counties. Before those protest actions were resolved, on August 25, 2006, appellant Lobb, on behalf of the Secretary, issued to appellees a letter certifying "that petitioners submitted 120,778 valid signatures on behalf of the proposed referendum and valid signatures from 20 of the 88 counties have met or exceeded 3% of the total number of votes cast for governor in the respective counties at the last gubernatorial election." The letter listed the number of valid signatures for each of the remaining 68 counties and the number of signatures by which the part-petitions were deficient in each of those counties. The letter then concluded: "[Appellees] will need to submit an additional 72,962 valid signatures and meet the 3% requirement in an additional 24 counties. Therefore, in accordance with R.C. 3519.16, your committee shall have ten additional days from the receipt of this notification to file additional signatures with this office."
 {¶ 5} On August 29, 2006, appellees filed a complaint and motion for temporary restraining order ("TRO") and preliminary injunction in the trial court. In essence, appellees argued that appellants should not have issued the August 25, 2006 notice-of-insufficiency letter until after all the protests had been resolved. They further argued that, since appellants issued the notice-of-insufficiency letter prematurely, the letter was invalid, and the ten-day period in which the committee could submit additional signatures and correct the inefficiency had not yet begun to run. The court denied the motion for TRO and held a preliminary injunction hearing on September 14, 2006.
 {¶ 6} On September 15, 2006, before the trial court had issued a decision on the motion for preliminary injunction, appellees filed supplemental signatures. On September 18, 2006, appellants notified the court of appellees' supplemental filing. Later that same day, the court issued its decision, which granted appellees' motion for preliminary injunction. On September 26, 2006, the court issued a preliminary injunction order. The order provided that the August 25, 2006 notice-of-insufficiency letter "is hereby stayed pursuant to Civ.R. 65(B) pending final determination of this action or until further order of the Court." The order also stated:
* * * This Order shall not prevent [appellants] from certifying a sufficient number of signatures for the referendum question to be placed on the November 7, 2006 general election ballot in the event that such is determined by [appellants] from the supplemental signatures filed by the petition committee on September 15, 2006. * * *
 {¶ 7} Appellants filed a timely appeal and raise a single assignment of error:
The trial court erred in issuing its September 18, 2006 "Decision and Entry Sustaining Plaintiffs' Motion for Preliminary Injunction Hearing, Filed August 29, 2006" and its September 26, 2006 "Preliminary Injunction Order."
 {¶ 8} As an initial matter, we consider appellants' assertion that the trial court's September 26, 2006 preliminary injunction order is final and appealable. Appellees do not argue otherwise, and we agree that the order is final and appealable.
 {¶ 9} R.C. 2505.02 defines the types of orders that may be reviewed on appeal. R.C. 2505.02(B) states, in pertinent part:
An order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following:
* * *
(4) An order that grants or denies a provisional remedy and to which both of the following apply:
(a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.
(b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.
 {¶ 10} We agree with appellants that the trial court's preliminary injunction order meets the requirements of R.C.2505.02(B)(4). As we detail below, the court's order stayed the August 25, 2006 letter, which declared that the petition at issue in this case did not contain a sufficient number of signatures, and enjoined appellants from taking action on the letter "until further order of the Court." The court issued its decision on September 18, 2006, and its order on September 26, 2006.
 {¶ 11} The Ohio Constitution provides that the petition and signatures shall be presumed to be sufficient unless proven otherwise not later than 40 days before the election. See Section1g, Article II, Ohio Constitution. The 40th day before the November 7, 2006 election was September 28, 2006. In the absence of appellants' letter declaring the petition insufficient or other action by the Secretary, then, appellees' petition and the signatures contained within it were presumed valid after that date.
 {¶ 12} Ohio law further provides that a vote rejecting a law submitted to voters pursuant to a referendum petition may not thereafter be invalidated "on account of the insufficiency of the petitions by which such submission of the same was procured[.]" Section 1g, Article II, Ohio Constitution. Thus, if the voters reject those portions of S.B. 7 on the November 7, 2006 ballot before appellants have fully litigated the sufficiency of the underlying petition, the November 7, 2006 vote will stand, even if appellants are ultimately successful.
 {¶ 13} Given these circumstances, we conclude that, if appellants were denied an immediate appeal from the trial court's order, appellants would be denied meaningful relief altogether. Therefore, the requirements of R.C. 2505.02(B) are met, and we consider appellants' assignment of error.
 {¶ 14} The standards by which a trial court must judge a motion for preliminary injunction are well-established. A moving party is entitled to injunctive relief if that party establishes: (1) a substantial likelihood of prevailing on the merits; (2) irreparable injury in the absence of injunctive relief; (3) no unjustifiable harm to third parties; and (4) that the injunction would serve the public interest. Vanguard Transp. Sys., Inc. v.Edwards Transfer Storage Co., Gen. Commodities Div. (1996),109 Ohio App.3d 786, 790, citing Valco Cincinnati, Inc. v. N DMachining Service, Inc. (1986), 24 Ohio St.3d 41.
 {¶ 15} The standard of review on appeal from the granting of injunctive relief is whether the trial court abused its discretion. Prairie Twp. Bd. of Trustees v. Ross, Franklin App. No. 03AP-509, 2004-Ohio-838, at ¶ 11, citing Perkins v. Villageof Quaker City (1956), 165 Ohio St. 120, 125. "Injunction is an extraordinary remedy equitable in nature, and its issuance may not be demanded as a matter of strict right; the allowance of an injunction rests in the sound discretion of the court and depends on the facts and circumstances surrounding the particular case[.]" Perkins, at syllabus. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. "Absent such a showing, this court cannot reverse."Prairie Twp. at ¶ 11. With this standard in mind, we turn now to the constitutional and legislative scheme for the filing and processing of a referendum petition.
 {¶ 16} With some exceptions not relevant here, the Ohio Constitution reserves for the people of the state of Ohio the power to adopt or reject, by vote at a general election, any law or section of law proposed by the General Assembly. Sections 1,1c, Article II, Ohio Constitution. The constitution sets out specific requirements for approving or rejecting a law by referendum. These requirements, the constitution provides, "shall be self-executing, except as herein otherwise provided. Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions [that is, provisions for initiative and referendum] or the powers herein reserved." Section 1g, Article II.
 {¶ 17} The referendum petition process begins when a committee of three to five people submits a written petition signed by 1,000 electors to the secretary of state with the full text and summary of the law to be referred to the voters. Once the secretary verifies the signatures and the attorney general verifies the accuracy of the summary, the committee drafts and circulates the petition or part-petitions for signature.
 {¶ 18} The constitution provides that, in order to be submitted to the voters, the total number of signatures on the referendum petition or part-petitions must equal at least six percent of the total votes cast for the office of governor at the last gubernatorial election. In addition, the signatures must be obtained from at least 44 of the 88 counties in Ohio and, from each of these 44 counties, there must be signatures equal to at least three percent of the total gubernatorial votes cast in that county. As applied here, appellees were required to submit a petition or part-petitions containing a total number of at least 193,740 valid signatures, which represents six percent of the total votes cast in the 2002 gubernatorial election, and those signatures must have been obtained from at least 44 counties and, for each of those counties, must have represented three percent of the total gubernatorial vote cast.
 {¶ 19} As for the time for filing a referendum petition, the committee must file a petition with the secretary of state within 90 days after the governor has filed with the secretary the law or section of law to be referred. Here, appellees filed the petition or part-petitions on June 29, 2006, one day prior to the 90-day deadline.
 {¶ 20} Pursuant to R.C. 3519.15, once a referendum petition is filed with the secretary, "he shall forthwith separate the part-petitions by counties and transmit such part-petitions to the boards of elections in the respective counties. The several boards shall proceed at once to ascertain" whether the signatures on the part-petitions are valid. The boards must submit a report to the secretary indicating the sufficiency or insufficiency of the signatures and whether the part-petition has been verified. Here, the Secretary transmitted the part-petitions to the boards of elections, the boards made their determinations as to the validity of the signatures, and the boards submitted their reports to the Secretary.
 {¶ 21} Appellants' August 25, 2006 notice-of-insufficiency letter reflects the results of the boards' reports. As noted, appellees submitted 120,778 valid signatures, and valid signatures from 20 counties met or exceeded the three percent requirement. Thus, based on the boards' reports, appellees' part-petitions were deficient by 72,962 total votes and short by 24 counties having signatures representing three percent of the last gubernatorial vote.
 {¶ 22} As permitted by statute, appellees protested some of the boards' findings. R.C. 3519.16 provides that a circulator, the committee or an elector may protest a board's finding. The protest must be in writing and must state the reasons for the protest. "Once a protest is filed, the board shall proceed to establish the sufficiency or insufficiency of the signatures and of the verification of those signatures" in an action in the common pleas court in the county. R.C. 3519.16 also provides, in pertinent part:
* * * The action shall be brought within three days after the protest is filed, and it shall be heard forthwith by a judge of that court, whose decision shall be certified to the board. The signatures that are adjudged sufficient or the part-petitions that are adjudged properly verified shall be included with the others by the board, and those found insufficient and all those part-petitions that are adjudged not properly verified shall not be included.
The properly verified part-petitions, together with the report of the board, shall be returned to the secretary of state not less than fifty days before the election * * *. The secretary of state shall notify the chairperson of the committee in charge of the circulation as to the sufficiency or insufficiency of the petition and the extent of the insufficiency.
If the petition is found insufficient because of an insufficient number of valid signatures, the committee shall be allowed ten additional days after the notification by the secretary of state for the filing of additional signatures to the petition.
 {¶ 23} The Ohio Constitution does not explicitly provide for a protest process. It does, however, state: "The petition and signatures upon such petitions shall be presumed to be in all respects sufficient, unless not later than forty days before the election, it shall be otherwise proved and in such event ten additional days shall be allowed for the filing of additional signatures to such petition." Section 1g, Article II.
 {¶ 24} Here, appellees filed protests in 11 counties and, pursuant to R.C. 3519.16, the 11 boards of elections filed actions in their respective common pleas courts. As noted, after appellees filed the protests, but before those protests were resolved, appellants issued the August 25, 2006 notice-of-insufficiency letter, which advised appellees of the petition's deficiencies. Appellees argued below, and the trial court found, however, that appellants issued the notice letter prematurely. R.C. 3519.16, the court found, requires the secretary to wait until all protest actions are resolved before issuing the notice-of-insufficiency letter and triggering the ten-day deadline for submitting supplemental signatures.
 {¶ 25} Before this court, appellants argue that the secretary need not delay issuance of a ten-day letter until after all protest actions have been resolved. In support, appellants direct us to the Supreme Court's recent opinion in State ex rel. Evansv. Blackwell, ___ Ohio St.3d ___, 2006-Ohio-4334. In Evans,
members of a committee responsible for a state initiative petition appealed from a judgment denying writs of prohibition and mandamus. The committee had filed with the secretary an initiative petition containing over 167,000 signatures from all 88 counties. The secretary transmitted part-petitions to the respective boards of elections for review, and the boards submitted their reports to the secretary. Beginning on December 21, 2005, protests were filed challenging the sufficiency of the boards' findings. Notably, in contrast to this case, the protests in Evans sought to prove that some of the signatures verified by the boards were not valid and, therefore, that the number of verified signatures was lower than that reported by the boards. On December 28, 2005, before the pending protests had been resolved, the secretary notified the committee that the petition contained 117,026 valid signatures and that this number was sufficient for the secretary to transmit the petition to the General Assembly. That same day, the secretary transmitted to the General Assembly the text and summary of the law proposed in the petition.
 {¶ 26} The protestor, Jacob Evans, filed a complaint in this court for an emergency writ of prohibition or, in the alternative, for a writ of mandamus against the secretary and the legislative clerks. Evans argued that, by not waiting to transmit the proposed law to the General Assembly until after the protests had been resolved and the boards of elections made any necessary supplemental reports, the secretary violated Section 1b, ArticleII, of the Ohio Constitution and/or usurped the role of the common pleas courts in determining the validity of the signatures. Although a magistrate of this court determined that the secretary was not prohibited from transmitting the petition to the general assembly before the protests were resolved, the court held that Evans was not entitled to a writ of prohibition because neither the secretary nor the clerks were exercising quasi-judicial authority in transmitting or accepting the petition. Evans appealed to the Ohio Supreme Court.
 {¶ 27} After disposing of Evans' claim in mandamus and a claim in prohibition he had not raised below, the court turned to Evans' "primary prohibition claim," in which he asserted that this court erred in denying a writ of prohibition "because the Secretary of State was required to wait for the completion of the common pleas court protest proceedings before he could transmit the initiative petition to the General Assembly." Id. at ¶ 26. The court reviewed the applicable constitutional and statutory provisions, including the language in Section 1g, Article II, providing that "[t]he petition and signatures upon such petitions shall be presumed to be in all respects sufficient, unless not later than forty days before the election, it shall be otherwise proved and in such event ten additional days shall be allowed for the filing of additional signatures to such petition." R.C.3519.15 and 3519.16, the court noted, are laws passed to "facilitate the operation of Sections 1b and 1g, Article II, of the Ohio Constitution." Evans at ¶ 28.
 {¶ 28} Turning to its analysis of these provisions, the court found that Evans' claim — that the secretary lacked authority to transmit the petition to the general assembly before the protests were resolved — "lacks merit." Id. at ¶ 32. Instead, the court found:
* * * Section 1b, Article II of the Ohio Constitution does not expressly condition the Secretary's duty to transmit the petition to the General Assembly upon receipt of reports after the completion of R.C. 3519.16 protest proceedings. After all, R.C.3519.16 sets no deadline by which an interested party must file a protest against a statewide initiative or referendum petition. Therefore, making the Secretary wait for a second set of verification reports from boards of elections that may never arrive unreasonably fails to advance the constitutional right of initiative. * * * Indeed, even R.C. 3519.16, when read in pari materia with R.C. 3519.15, does not explicitly command the Secretary to await the conclusion of all protest proceedings before transmitting the petition to the General Assembly. * * *
Id.
 {¶ 29} "The Secretary of State's interpretation of the pertinent constitutional and statutory provisions[,]" the court found, "is not unreasonable. We must therefore defer to the Secretary's reasonable interpretation." Id. at ¶ 34.
 {¶ 30} As applied here, appellants argue, Evans compels a finding in this case that the Secretary's interpretation of the pertinent constitutional and statutory provisions is not unreasonable. In other words, appellants' issuance of the August 25, 2006 notice-of-insufficiency letter, without first waiting for the pending protests to be resolved, was reasonable.
 {¶ 31} Appellees argue, however, that Evans is not controlling here. Evans, appellees note, dealt with the power of the secretary of state to transmit a law proposed by initiative petition to the general assembly under Section 1b, Article II, of the Ohio Constitution, not the power of the secretary to send a letter of deficiency regarding a law proposed by referendum petition under Section 1g, Article II, of the Ohio Constitution. Section 1b, requires the secretary to transmit an initiative petition to the general assembly once it is "verified as herein provided[.]" In contrast, appellees note, Section 1g, presumes a referendum petition and signatures upon the petition "to be in all respects sufficient," unless "it shall be otherwise proved" not later than 40 days before the election. We find, however, that our beginning point is not Section 1g of Article II, but Section 1c of Article II.
 {¶ 32} Section 1c, Article II, designates the referendum power as the "second aforestated power reserved by the people[.]" Section 1c provides, in pertinent part:
* * * When a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, ordering that such law, section of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection, the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election * * *.
 {¶ 33} In short, Section 1c of Article II provides that the secretary of state "shall submit to the electors of the state for their approval or rejection such law, section or item" once a petition, signed by six percent of the electors of the state "and verified as herein provided" has been filed. As the court found in Evans, Section 1b of Article II similarly provides that the secretary "shall transmit" to the general assembly a law proposed by initiative petition once a petition, signed by three percent of the electors "and verified as herein provided" has been filed. And, we note that Section 1a of Article II also provides that the secretary "shall submit for the approval or rejection of the electors" a proposed constitutional amendment once a petition, signed by ten percent of the electors of the state and "verified as herein provided," is filed. Thus, Article II of the Ohio Constitution expressly requires the secretary to act immediately — by submitting a proposed constitutional amendment to the voters under Section 1a, transmitting an initiated law to the General Assembly under Section 1b or submitting a proposed approval or rejection of a law to the voters under 1c — upon the filing of a petition with the requisite number of signatures "verified as herein provided[.]"
 {¶ 34} In Cappelletti v. Celebrezze, Jr. (1979),58 Ohio St.2d 395, 396, the Supreme Court of Ohio recognized that the phrase "verified as herein provided" "is a phrase used throughout Article II of the Constitution." That phrase, the court found, requires the secretary of state "as chief elections officer to first determine that the petition contains the purported signatures of [3 percent] of the electors of the state, for that requirement is fundamental to the constitutional reservation of the right of initiative to the people." Id. The court then expressly "reject[ed] relators' argument that the presumption of sufficiency of the petition and its signatures, contained in Section 1g of Article II, eliminates the further steps of determining whether the petition has been properly verified and establishing the eligibility of the signers as electors." Id. at 3963-97. Rather, "[v]erification and the determination of the status of the signers can best be, and is by statute to be, performed by sending the petitions * * * to the county boards of election to be viewed together with the records there kept for the purpose of assisting the Secretary of State in arriving at his verification of the signatures and his determination of the qualifications as elector of the individual resident signers." Id. at 397.
 {¶ 35} In short, as used throughout Article II, the phrase "verified as herein provided" refers to the secretary's initial verification, as well as the boards' initial reports, whether used in Section 1a, 1b or 1c of Article II. This language is not unique to Section 1b, and we reject appellees' attempt to distinguish Section 1c, and Evans, on that basis.
 {¶ 36} We turn now to Section 1g of Article II, which applies to both initiative petitions under Section 1b and referendum petitions under Section 1c. As noted, Section 1g provides, in pertinent part: "The petition and signatures upon such petitions shall be presumed to be in all respects sufficient, unless not later than forty days before the election, it shall be otherwise proved and in such event ten additional days shall be allowed for the filing of additional signatures to such petition." According to appellees, this language, along with R.C. 3519.16, precludes the secretary from acting until the protest actions, by which the boards may "otherwise prove" the insufficiency of the signatures, have been resolved.
 {¶ 37} We return to Cappelletti, wherein the Supreme Court considered the connection between the boards' verification process and the "presumed sufficient" language in Section 1g of Article II. The court found: "The fact that such inquiry [by the boards of elections] is contemplated by the language of the constitutionally provided presumption is implicit in its terms, for they provide that the presumption is subject to disproof up until 40 days before an election." Cappelletti at 397. And, most importantly for our purposes here, the court stated: "It is evident that such disproof might be accomplished in various ways, but it is accomplished most effectively by the boards of elections, which have control of the election and registration records and poll books of those whose addresses have been given in connection with the signing, comparing the purported signatures with those enrolled in these records." Id. Thus, the board reviews alone are sufficient to disprove the sufficiency of a petition and signatures under Section 1g.
 {¶ 38} We acknowledge, as appellees argue, that R.C. 3519.16
appears to provide a straightforward process for the filing of protests: a protestor files a protest with a board of elections; the board files an action in common pleas court within three days; the court hears the action "forthwith" and certifies its decision to the board; the board submits a new report to the secretary no later than 50 days before the election; the secretary notifies the committee as to the sufficiency or the extent of the insufficiency of the petition; and, if the petition is insufficient, the committee is allowed ten days to submit additional signatures. As we have often stated, an "`unambiguous statute is to be applied, not interpreted.'" Northfield ParkAssoc. v. Ohio State Racing Comm., Franklin App. No. 05-749, 2006-Ohio-3446, at ¶ 18, quoting Sears v. Weimer (1944),143 Ohio St. 312, paragraph five of the syllabus.
 {¶ 39} Nevertheless, we conclude that the Supreme Court has interpreted R.C. 3519.16 and found that it does not command the secretary to await the conclusion of all protest proceedings before transmitting a petition to the general assembly. For this court to find in this case that R.C. 3519.16 does command the secretary to await the conclusion of all protest proceedings before notifying a petition committee of a deficiency would be inconsistent with the Evans holding and reasoning. WhileEvans involved an initiative petition under Section 1b, and this case involves a referendum petition under Section 1c, the applicable constitutional and statutory language at issue is precisely the same.
 {¶ 40} Moreover, as the Cappelletti court found, the boards' review itself is a method of proving or disproving the sufficiency of the signatures. While the petition and signatures may have been presumed sufficient at the time of their filing, the boards' reports disproved their sufficiency, thus triggering notice from the Secretary of the ten-day timeframe for filing additional signatures under Section 1g of Article II.
 {¶ 41} Finally, we address appellees' argument that appellants' August 25, 2006 letter was invalid because it did not indicate "the extent of the insufficiency," as R.C. 3519.16
requires. We find, however, that appellants' letter did indicate the extent of the insufficiency, at least as determined by the boards of elections. The extent of the insufficiency might have changed after August 25, 2006, depending on the outcome of the protests pending at that time, as well as any other protests that might have followed. The possibility of subsequent change, however, does not preclude the secretary from issuing a notice-of-insufficiency letter, nor does it invalidate such a letter. As the court found in Evans, R.C. 3519.16 "sets no deadline by which an interested party must file a protest against a statewide initiative or referendum petition. Therefore, making the Secretary wait for a second set of verification reports from boards of elections that may never arrive unreasonably fails to advance the constitutional right of initiative." Evans at ¶ 32. We likewise find that making the secretary wait for a second set of verification reports unreasonably fails to advance the constitutional right of referendum.
 {¶ 42} In the end, based on the plain language of Article II and the Supreme Court's interpretation of Article II inCappelletti, we find that the reports of the boards of elections "otherwise proved" that the referendum petition at issue here was insufficient, thus triggering the secretary's letter, which gives notice of the ten-day timeframe for filing supplemental signatures under Section 1g of Article II. In order to read R.C. 3519.16 in pari materia with Section 1g, and consistent with the Supreme Court's interpretation of R.C.3519.16 in Evans, we find that the secretary need not wait for protest actions filed under R.C. 3519.16 to be resolved before certifying the number of valid signatures contained on part-petitions, certifying that a referendum petition is insufficient for placement on the ballot, and notifying the petition committee that it may file supplemental signatures to correct the insufficiency within ten days. The trial court having come to a contrary conclusion in determining that appellants were not likely to succeed on the merits of their appeal, we find that the trial court abused its discretion when it granted appellees' motion for preliminary injunction and issued its preliminary injunction order. Therefore, we sustain appellants' assignment of error.
 {¶ 43} Having sustained appellants' assignment of error, we reverse the September 18, 2006 decision of the trial court, and we lift the stay imposed on appellants' August 25, 2006 letter by the trial court's September 26, 2006 order.
Judgment reversed.
Brown and Sadler, JJ., concur.