[Cite as *Clayton v. Ohio Bd. of Nursing*, 2014-Ohio-2077.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Beverly Clayton, C.N.P., R.N.,       :

           Appellant-Appellant,       :

                                            No. 13AP-726
v.                                    :          (C.P.C. No. 12CV-13572)

Ohio Board of Nursing,                 :          (REGULAR CALENDAR)

           Appellee-Appellee.         :

D E C I S I O N

Rendered on May 15, 2014

*Sindell and Sindell, LLP*, *Steven A. Sindell* and *Rachel Sindell*, for appellant.

*Michael DeWine*, Attorney General, and *Henry G. Appel*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Appellant-appellant, Beverly Clayton, appeals a judgment of the Franklin County Court of Common Pleas affirming the order of appellee-appellee, the Ohio Board of Nursing ("Board"), that suspended Clayton's registered nursing license and certified nurse practitioner certificate. For the following reasons, we affirm the trial court's judgment.

{¶ 2} At approximately 4:10 p.m. on August 27, 2009, Patient 1, an 80-year-old man, arrived at the emergency department of Mercy Franciscan Hospital – Western Hills

("Mercy").[1]  Patient 1 was in poor health; he suffered from congestive heart failure, atrial fibrillation, chronic renal failure, and chronic obstructive pulmonary disease.  He presented at Mercy complaining of shortness of breath.

{¶ 3}  Dr. Jamelle Bowers, a Mercy hospitalist,[2] was assigned as Patient 1's attending physician.  Bowers examined Patient 1 and decided to admit him to Mercy's intensive care unit ("ICU").  At 6:15 p.m., Dr. Bowers handwrote a series of orders on a single-page form marked "PHYSICIAN'S ORDERS."  In relevant part, those orders included:  the administration of 40 milligrams of the drug Lasix (also known as furosemide) every eight hours to stimulate urine output; the administration of a 15 milligram bolus of the drug Cardizem (also known as diltiazem) and then an intravenous Cardizem drip titrated to bring Patient 1's heart rate below 100 beats per minute; a consultation with Dr. Kennealy, a pulmonologist; a consultation with Dr. Desai, a cardiologist; and a saline lock, which precluded the administration of normal saline to Patient 1.  An emergency department nurse faxed Dr. Bowers' orders to the hospital pharmacy.

{¶ 4}  Patient 1 was transferred to the ICU sometime between 6:30 and 6:50 p.m.  Soon after Patient 1 arrived at the ICU, Clayton's 7:00 p.m. to 7:00 a.m. shift as the ICU charge nurse began.  Patient 1 was assigned to Clayton's care.

{¶ 5}  According to Clayton, she was overloaded with responsibilities during her shift.  She was assigned the direct care of two patients.  Additionally, she frequently had to step in to assist two inexperienced nurses with the care of their patients.  She also had to act as unit secretary, which required her to enter physician's orders into the hospital computer system, initiate consultations, and answer the ICU phone.

{¶ 6}  Clayton did not review the physician's orders for Patient 1.  Instead, Clayton relied on the information in the hospital computer system to care for Patient 1.  Because a hospital pharmacist had entered that information into the computer system, it related solely to the medications that Dr. Bowers had ordered for Patient 1.  Not only was the information limited, it was also wrong.  The pharmacist had incorrectly entered into the

---

[1] We, like the Board and trial court, refer to the patient involved in this case as "Patient 1" to protect his privacy.

[2] Dr. Bowers is actually Mercy's lead hospitalist and directs Mercy's hospitalist program.

computer Dr. Bowers' order for the administration of Cardizem. Rather than calling for a 15 milligram bolus and then a titrated dose to decrease Patient's 1 heart rate to less than 100 beats per minute, the information entered into the computer indicated that Patient 1 was to receive one 25 milligram bolus. Clayton administered a 25 milligram bolus of Cardizem to Patient 1 at 10:16 p.m. She also administered one 40 milligram bolus of Lasix at 10:16 p.m.

{¶ 7} During the course of Clayton's shift, Patient 1 received 1,097 milliliters of normal saline, despite the saline lock ordered by Dr. Bowers. In addition to failing to maintain the saline lock, Clayton did not carry out Dr. Bowers' orders to: (1) administer 40 milligrams of Lasix every eight hours, (2) establish an intravenous Cardizem drip and titrate the drip to achieve a reduction in Patient 1's heart rate to less than 100 beats per minute, and (3) initiate the pulmonary and cardiology consultations.

{¶ 8} Throughout the night, Patient 1's heart rate remained above 100 beats per minute. At 2:00 a.m., his blood pressure had fallen to 99/45, and it continued to fall after that point. Despite the administration of Lasix at 10:16 p.m., his fluid output did not increase. The administration of Cardizem (also at 10:16 p.m.) was likewise ineffective.

{¶ 9} At 4:00 a.m., Clayton notified the hospitalist on call, Dr. Kern Chaudhry, of Patient 1's condition. Although Dr. Chaudhry treated Patient 1, his condition continued to deteriorate.

{¶ 10} Dr. Bowers arrived at the hospital at 7:00 a.m. on August 28, 2007. She visited Patient 1 and found him unresponsive and near death. Dr. Bowers became agitated when she saw that her orders had not been followed. Patient 1 died at 11:17 a.m.

{¶ 11} In a notice dated November 19, 2010, the Board informed Clayton that it proposed to revoke, suspend, or restrict her registered nursing license and certified nurse practitioner certificate because of the allegedly substandard care that Clayton had provided to Patient 1. The notice asserted that the Board could take disciplinary action against Clayton under R.C. 4723.28(B)(16), because she had violated rules adopted under R.C. Chapter 4723, and (2) R.C. 4723.28(B)(19), because she had "[f]ail[ed] to practice in accordance with acceptable and prevailing standards of safe nursing care." The notice alleged that Clayton had violated:

- Ohio Adm.Code 4723-4-06(H), which requires a licensed nurse to "implement measures to promote a safe environment for each patient;"

- Ohio Adm.Code 4723-4-03(C), which requires a registered nurse to "demonstrate competence and accountability in all areas of practice in which the nurse is engaged [including] (1) [c]onsistent performance of all aspects of nursing care; and (2) [r]ecognition, referral or consultation, and intervention, when a complication arises;"

- Ohio Adm.Code 4723-4-03(E), which requires a registered nurse to, "in a timely manner: (1) [i]mplement any order for a patient * * * [and] (2) [c]larify any order for a patient when the registered nurse believes or should have reason to believe the order is: (a) [i]nacurrate; (b) [n]ot properly authorized; (c) [n]ot current or valid; (d) [h]armful, or potentially harmful to a patient; or (e) [c]ontraindicated by other documented information;" and

- Ohio Adm.Code 4723-4-03(G), which requires a registered nurse to, "in a timely manner, report to and consult as necessary with other nurses or other members of the health care team and make referrals as necessary."[3]

{¶ 12} Clayton requested a hearing. At the hearing, Clayton testified that she reviewed Patient 1's chart, but the physician's orders were missing from the chart. She was too busy dealing to more urgent matters to seek out the physician's orders. Clayton waited until 4:00 a.m. to request Dr. Chaudhry's intervention because Patient 1 was awake and communicating with her prior to that time. Clayton claimed that she gave Patient 1 1,097 milliliters of normal saline, despite the saline lock, because Dr. Chaudhry verbally ordered it.[4]

{¶ 13} The Board presented witness testimony that cast doubt on Clayton's contention that she did not read the physician's orders because they were absent from the

---

[3] Each of these rules appears in Ohio Adm.Code Chapter 4723-4, which establishes "[m]inimal acceptable standards of safe and effective nursing practice for a registered nurse and a licensed practical nurse in any setting." Ohio Adm.Code 4723-4-01(A)(1).

[4] A subsequent physician's order will supercede a conflicting, earlier physician's order. Clayton, therefore, could not be faulted for failing to maintain a saline lock if Dr. Chaudhry gave orders at 4:00 a.m. that contradicted the saline lock that Dr. Bowers ordered at 6:15 p.m. the prior day.

chart.   Joyce Keegan, the vice president for nursing at Mercy and Mt. Airy Hospital, investigated the incident for Mercy.   Keegan testified that Clayton had told her that she lacked the time to look at Patient 1's chart, rather than, as Clayton testified at trial, that she looked but could not find Patient 1's physician's orders in the chart.  Diane Helferich, a Board compliance agent, interviewed Clayton after the Board received a complaint regarding her care of Patient 1.  She also testified that Clayton had told her that she did not review the physician's orders because she did not have the time to do so.  Finally, Dr. Bowers testified that on the morning of August 28, 2009, she "very easily" found the physician's orders in Patient 1's chart.  (Tr. 675.)

{¶ 14} The Board also pointed out the absence of any written order from Dr. Chaudhry directing the administration of normal saline.   The medical records only include a nurse's note, written by Clayton at 4:00 a.m., that states, "IVF ↑'d to 250 cc NS."   In other words, Clayton increased Patient 1's receipt of intravenous fluids to 250 milliliters of normal saline at 4:00 a.m.  Even if this nurse's note memorialized a verbal order from Dr. Chaudhry to give Patient 1 a 250 milliliter bolus of normal saline, it did not account for 847 milliliters of the total amount of 1,097 milliliters of normal saline administered to Patient 1 during Clayton's shift.

{¶ 15} To establish that Clayton did not meet the minimum standards of safe nursing care, the Board offered the expert testimony of Lisa Klenke, a registered nurse. Klenke testified that Clayton failed to practice in accordance with acceptable and prevailing standards of safe nursing care when she did not review and implement the physician's orders for the care of Patient 1.  According to Klenke, if Clayton could not find physician's orders for Patient 1 in his chart, she should have contacted the physician. Keegan, the vice president of nursing at Mercy, testified similarly.  Keegan explained that the absence of physician's orders triggers an obligation to call the physician.  As Keegan stated, physician's orders are "the crux of everything [a nurse] ha[s] to do for that patient[;] * * * a nurse only acts on orders from a physician for dependent care of that patient." (Tr. 392.)

{¶ 16} Klenke was also critical of Clayton's failure to timely recognize that Patient 1's deteriorating condition required intervention by a physician.   Klenke testified that Clayton should have notified a physician that Patient 1 had not responded to the Lasix

administered at 10:16 p.m. Clayton should have also sought a physician's assistance when she measured Patient 1's systolic blood pressure at 99 at 2:00 a.m. Dr. Bowers generally concurred with Klenke's assessment. Dr. Bowers testified that Clayton should have called for a physician by midnight because Patient 1 had not responded to the Cardizem, which like the Lasix, was administered at 10:16 p.m. Dr. Bowers also testified that, as a physician, she would have expected Clayton to call at 2:00 a.m. when Patient 1's systolic blood pressure dropped below 100.

{¶ 17} Finally, Klenke rejected the opinion of Clayton's expert witness that it was impossible for Clayton to comply with the standard of care for Patient 1. Klenke stated that Clayton should have asked for help once she realized that she could not adequately care for Patient 1 given the other demands on her time. Keegan testified to Mercy's protocol for obtaining additional nursing assistance. According to Keegan, the charge nurse should contact her supervisor, the clinical administrator, or, in the absence of the clinical administrator, the emergency department charge nurse. Those individuals might seek the assistance of an on-call nurse, switch a nurse from a different unit to the busy unit, or call on other staff.

{¶ 18} In a report and recommendation dated July 31, 2012, the hearing examiner found that the physician's orders were in Patient 1's chart when Patient 1 was admitted to the ICU from the emergency department and remained part of the chart throughout the time Patient 1 was in the ICU. The hearing examiner also found that, after arriving at Patient 1's bedside at approximately 4:00 a.m., Dr. Chaudhry gave Clayton an order to give Patient 1 a 250 milliliter bolus of normal saline, but Dr. Chaudhry did not order any additional normal saline from that point on. Finally, the hearing examiner found that Clayton should have consulted with a physician as early as 10:16 p.m. after the bolus of Cardizem failed to reduce Patient 1's heart rate, or at least by 2:00 a.m. due to Patient 1's significant drop in blood pressure from the previous reading.

{¶ 19} Based on the evidence, the hearing examiner determined that Clayton failed to practice in accordance with acceptable and prevailing standards of safe nursing care and violated the specified administrative rules by: (1) failing to locate and implement the physician's orders, and (2) failing to timely consult with a Mercy physician about Patient 1's declining condition. The hearing examiner also found that the chaotic and

overwhelming circumstances of the ICU did not relieve Clayton of her duty to practice within the acceptable and prevailing standards of safe nursing care. However, the hearing examiner did consider the chaotic and overwhelming circumstances a mitigating factor in determining the appropriate discipline.

{¶ 20} The hearing examiner recommended that the Board suspend Clayton's registered nursing license and certified nurse practitioner certificate indefinitely, but not less than one year. The hearing examiner specified conditions for reinstatement; probationary terms, conditions, and limitations to apply for a minimum of two years after the reinstatement of Clayton's license; and permanent practice restrictions.

{¶ 21} In an adjudication order dated September 21, 2012, the Board accepted the hearing examiner's findings of fact and conclusions of law. The Board modified the recommended sanction by changing the conditions for reinstatement; altering the terms, conditions, and limitations for the probationary period after reinstatement; and deleting the permanent practice restrictions.

{¶ 22} Clayton appealed the Board's order to the trial court. After considering Clayton's assignments of error, the trial court affirmed the Board's order.

{¶ 23} Clayton now appeals the July 25, 2013 final judgment of the trial court, and she assigns the following errors:

> (1) In an administrative evidentiary hearing held before a Hearing Examiner (H.E.) of the Ohio Board of Nursing (OBN) involving alleged nursing practice violations against the license of Appellant Nurse, it is reversible error, contrary to law and in violation of Due Process of Law for the Hearing Examiner to prohibit and deny Respondent Nurse the right to obtain by hearing subpoena and present in the hearing evidence highly relevant and material to her defense against the charges and to her defense in mitigation of sanctions.
>
> (2) There is no evidence in the record to support the charge against Appellant that she continued uninterruptedly to administer IV saline to Patient 1 during her shift, despite the fact that a physician had ordered a saline lock * * *.
>
> (3) Although not listed as an allegation in the Notice of Opportunity for Hearing, there is scant if any evidence that

Appellant gave Patient 1 a saline bolus without any Physician Order.

(4) Appellant gave Patient 1 a 25 mg. Cardizem (also known as Diltiazem) bolus and not a 15 mg. Cardizem drip because she followed the erroneous pharmacy order to do so which had been entered into the computer.

(5) The claimed violation in the Notice of Opportunity for Hearing that Appellant waited too long, until 4:00 a.m. on August 28, 2009, to notify the night hospitalist, Dr. Chaudhry, is an unfounded exercise in 20/20 hindsight.

(6) The Hearing Examiner erroneously shifted the burden of proof by a preponderance of the evidence from the OBN/State to Appellant.

(7) It was reversible error to have permitted Nurse Klenke, a member of the Board during its investigation into the performance of Appellant, to testify as an expert witness (when she was thereafter no longer a Board member) and for the Board to deliberate and decide upon its Adjudication Order in this case when Nurse Klenke had returned to the Board and was a member of the Board while the Board engaged in its deliberations and made its decision in this case.

{¶ 24} Pursuant to R.C. 119.12, when a common pleas court reviews an order of an administrative agency, the court must consider the entire record to determine if the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. To be "reliable," evidence must be dependable and true within a reasonable probability. *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). To be "probative," evidence must be relevant or, in other words, tend to prove the issue in question. *Id.* To be "substantial," evidence must have some weight; it must have importance and value. *Id.*

{¶ 25} In reviewing the record for reliable, probative, and substantial evidence, the trial court " 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *AmCare, Inc. v. Ohio Dept. of Job & Family Servs.*, 161 Ohio App.3d 350, 2005-Ohio-2714, ¶ 9 (10th Dist.), quoting *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (10th Dist.1981). In doing so,

the trial court must give due deference to the administrative resolution of evidentiary conflicts because the agency, as the fact finder, is in the best position to observe the manner and demeanor of the witnesses. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111 (1980).

{¶ 26} Unlike a trial court, an appellate court may not review the evidence. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). An appellate court is limited to determining whether the trial court abused its discretion. *Id.* Absent such an abuse of discretion, an appellate court must affirm the trial court's judgment, even if the appellate court would have arrived at a different conclusion than the trial court. *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261 (1988). When reviewing the trial court's judgment as to whether an agency's decision is in accordance with law, an appellate court's review is plenary. *Spitznagel v. State Bd. of Edn.*, 126 Ohio St.3d 174, 2010-Ohio-2715, ¶ 14.

{¶ 27} By her first assignment of error, Clayton argues that the hearing examiner erred in refusing to fulfill her request to issue a subpoena for the medical records of the other patients present in the ICU during her shift. Even if the hearing examiner erred as alleged, Clayton is not entitled to reversal because she has not shown how that alleged error prejudiced her.

{¶ 28} Pursuant to R.C. 119.09:

> the agency may, and upon the request of any party receiving notice of the hearing as required by section 119.07 of the Revised Code shall, issue a subpoena for any witness or a subpoena duces tecum to compel the production of any books, records, or papers, directed to the sheriff of the county where such witness resides or is found, which shall be served and returned in the same manner as a subpoena in a criminal case is served and returned.

Thus, if requested by a party to an adjudicatory hearing, an administrative agency must issue a subpoena to compel the attendance of a witness or the production of documents at the hearing. *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (1990); *Walters v. Ohio State Dept. of Adm. Servs.*, 10th Dist. No. 06AP-472, 2006-Ohio-6739, ¶ 29; *Northfield Park Assoc. v. Ohio State Racing Comm.*, 10th Dist. No. 05AP-749, 2006-Ohio-3446, ¶ 63. However, to secure a reversal on the basis that the administrative

agency failed to issue a requested subpoena, a party must demonstrate that the failure resulted in prejudice. *Burneson v. Ohio State Racing Comm.*, 10th Dist. No. 08AP-794, 2009-Ohio-1103, ¶ 24; *Korn v. Ohio State Med. Bd.*, 61 Ohio App.3d 677, 686 (10th Dist.1988).

{¶ 29} Here, Clayton sought the medical records of the other ICU patients in order to show the care required by and provided to those patients during her shift. Clayton wanted that information so she could point to circumstances involving those patients that demanded her intervention. The hearing examiner denied Clayton's subpoena request to avoid infringing on the privacy and confidentiality protections afforded to the other patients and because the information Clayton sought could be obtained through other sources.

{¶ 30} Although the hearing examiner refused to issue a subpoena for the other patients' medical records, he granted Clayton's request to issue subpoenas to two ICU nurses who worked the overnight shift on August 27 and 28, 2009. Those nurses could have testified regarding what occurred during the shift, including the assistance Clayton had to provide to other patients. Clayton, however, did not call either nurse to testify. The hearing examiner also allowed Clayton to testify regarding the care she provided to other patients. Clayton stated that she "put[ ] I.V.s in for nurses that [could] not do that themselves" and "start[ed] Amiodarone drips for another patient where a nurse did not know what [an] Amiodarone drip was." (Tr. 81.) Because the hearing examiner afforded Clayton the opportunity to present witness testimony regarding the needs of the other patients, Clayton cannot now demonstrate prejudice due to the nondisclosure of the other patients' medical records.

{¶ 31} In a last ditch effort to show prejudice, Clayton argues that witnesses' memories fade, and the medical records would have been necessary to refresh those memories. If Clayton had established at the hearing deficiencies in her or the other nurses' memories, this argument might have succeeded. However, Clayton failed to establish any such deficiencies. Accordingly, we conclude that no prejudice resulted from the hearing examiner's failure to issue the subpoena in question, and we overrule Clayton's first assignment of error.

{¶ 32} Both Clayton's second and third assignments of error concern her administration of normal saline to Patient 1. We will address them together. By her second assignment of error, Clayton argues that the record does not contain any evidence that she uninterruptedly administered normal saline to Patient 1 during her shift. By her third assignment of error, Clayton argues that the record does not contain any evidence that she administered normal saline to Patient 1 without a physician's order.

{¶ 33} The Board did not find that Clayton uninterruptedly administered normal saline to Patient 1 during her shift. Although medical records established that Clayton gave Patient 1 a total of 1,097 milliliters of normal saline during her shift, the evidence was equivocal regarding the exact time, or times, that Patient 1 received the normal saline. Therefore, the Board made no findings tying the administration of normal saline to a particular period during Clayton's shift. Rather, the Board simply found that Clayton administered a total of 1,097 milliliters of normal saline to Patient 1 during her shift.

{¶ 34} Clayton explained her administration of normal saline to Patient 1, despite Dr. Bowers' order of a saline lock, by claiming that that Dr. Chaudhry ordered it. The question before the Board, therefore, was whether Dr. Chaudhry had authorized the administration of the 1,097 milliliters of normal saline, thus supplanting Dr. Bowers' earlier order of a saline lock.

{¶ 35} After considering the evidence, the Board found that Dr. Chaudhry only ordered Clayton to administer a 250 milliliter bolus of normal saline to Patient 1. Clayton, however, argues that the evidence shows that Dr. Chaudhry ordered Clayton to give Patient 1 a 1,097 milliliter saline bolus. Clayton's testimony was the only evidence in the record that Dr. Chaudhry authorized the administration of all 1,097 milliliters of normal saline to Patient 1. The Board did not believe that testimony. We cannot second-guess that credibility determination. *Applegate v. State Med. Bd.*, 10th Dist. No. 07AP-78, 2007-Ohio-6384, ¶ 21.

{¶ 36} Subtracting 250 milliliters (the amount of normal saline ordered by Dr. Chaudhry) from 1,097 milliliters (the total amount administered) yields the result of 847 milliliters. Therefore, Clayton administered 847 milliliters of normal saline to Patient 1 without a physician's order to do so and despite Dr. Bowers' prohibition against the administration of normal saline. We thus find no abuse of discretion in the trial court's

determination that reliable, probative, and substantial evidence supports the Board's conclusion that Clayton did not comply with the physician's orders regarding the administration of normal saline. Accordingly, we overrule Clayton's second and third assignments of error.

{¶ 37} By Clayton's fourth assignment of error, she argues that the trial court erred in affirming the Board's decision to discipline her for failing to follow the physician's order to administer a Cardizem drip to Patient 1 when that order did not appear in Mercy's computer system. We disagree.

{¶ 38} The Board concluded that the acceptable and prevailing standards of safe nursing care require an ICU nurse to locate and implement the physician's orders for a patient under the nurse's care. Clayton, admittedly, did not locate and implement the physician's orders for Patient 1. Instead, she relied on the information entered by a pharmacist into the hospital computer system to determine what kind of and how much medication to administer. The pharmacist failed to enter Dr. Bowers' order for an intravenous Cardizem drip titrated to reduce Patient 1's heart rate below 100 beats per minute.

{¶ 39} Clayton argues that the error in the pharmacist's computer entry justifies her failure to administer the intravenous Cardizem drip. We are not persuaded. The physician's orders, not the pharmacist's entry, dictated the course of Patient's 1 care. As the Board found, Clayton violated the standard of care and applicable administrative rules when she failed to locate and implement the physician's order. The pharmacist's error does not excuse this violation. Accordingly, we overrule Clayton's fourth assignment of error.

{¶ 40} By Clayton's fifth assignment of error, she argues that the trial court erred in affirming the Board's decision to discipline her for waiting too long to seek a physician's assistance with Patient 1. We disagree.

{¶ 41} Both Klenke and Dr. Bowers testified that Clayton should have contacted a hospitalist regarding Patient 1's condition when he did not respond to the medication administered at 10:16 p.m. and when his systolic blood pressure dropped below 100 at 2:00 a.m. Relying on this testimony, the Board concluded that Clayton did not timely recognize and notify a hospitalist of Patient 1's deteriorating condition, and, thus, she

violated the acceptable and prevailing standards of safe nursing care and the specified administrative rules.

{¶ 42} Clayton argues that the trial court should have rejected Klenke's and Dr. Bowers' testimony in favor of her testimony that a physician's intervention was not necessary until 4:00 a.m., when Patient 1 became unable to interact with her. Our role, however, is not to determine which testimony is more credible or worthy of greater weight. *Ressler v. Ohio Dept. of Transp.*, 10th Dist. No. 09AP-338, 2009-Ohio-5857, ¶ 13. Rather, we only determine whether the trial court abused its discretion in determining whether reliable, probative, and substantial evidence supported the administrative agency's order. *Id.* Here, we find no such abuse of discretion. Accordingly, we overrule Clayton's fifth assignment of error.

{¶ 43} By Clayton's sixth assignment of error, she argues that the Board erroneously shifted the burden of proof onto her. We disagree.

{¶ 44} In an administrative proceeding, the party asserting the affirmative of an issue bears the burden of proof. *Nucklos v. State Med. Bd.*, 10th Dist. No. 09AP-406, 2010-Ohio-2973, ¶ 17. A burden of proof is a composite burden requiring the party on whom it rests to go forward with the evidence (the burden of production) and to convince the trier of fact by some quantum of evidence (the burden of persuasion). *Chari v. Vore*, 91 Ohio St.3d 323, 326 (2001).

{¶ 45} Here, the Board had the burden of producing evidence and persuading the finder of fact that Clayton failed to provide nursing care to Patient 1 in accordance with the acceptable and prevailing standards of safe nursing care and the specified administrative rules. The hearing examiner recognized that the Board had that burden of proof, and he determined that the Board carried its burden. Report and Recommendation of the Hearing Examiner, at ¶ F of the Conclusions of Law.

{¶ 46} In the course of deciding whether the Board had satisfied its burden of proof, the hearing examiner resolved a conflict in the evidence over whether the physician's orders were contained in Patient 1's chart when he was admitted to the ICU. In relevant part, the hearing examiner stated:

> Respondent has contended that Dr. Bower[s'] Physician's Orders were not part of Patient 1's chart when he was admitted to the Hospital ICU from the [emergency

department].  As noted in my Findings of Fact, I do not find that this contention is supported by the preponderance of the evidence.  Respondent's main evidence to support this contention is Respondent's hearing testimony where she contends that Physician's Orders were not part of [ ] Patient 1's chart.  (Tr. 95).  I do not find this testimony credible in that in both the Hospital and Board investigation interviews shortly after this incident Respondent openly admitted that she did not look at the Physician's Orders during her shift and in neither interview did she contend that the Physician's Orders were not part of Patient 1's chart.  The most direct and compelling testimony on this issue came from the author of the Physician's Orders, Dr. Bowers, who testified that, upon arriving at the end of the Respondent's shift on August 28 and seeing Patient 1 with an I.V. running in direct violation of one item in the Physician's Order[s], she "very easily" found the Physician's Orders in Patient 1's chart.

(Footnote omitted.)  Report and Recommendation of the Hearing Examiner, at 35-36.

{¶ 47}  The hearing examiner blundered when he used the phrase "preponderance of the evidence" in evaluating contradictory evidence.  The hearing examiner was not determining whether Clayton's evidence satisfied a pre-set level of persuasiveness necessary to carry a burden of proof.  Rather, the hearing examiner was comparing conflicting evidence and determining which evidence was more credible.  Although erroneously expressed, read in context, the passage at issue communicates that Clayton's evidence is not as convincing as the Board's evidence.  As the Board's evidence directly contradicted Clayton's evidence, the hearing examiner rejected Clayton's evidence and made a factual finding based on the Board's evidence.

{¶ 48}  Although the hearing examiner inappropriately phrased his discussion of an evidentiary conflict, he correctly held the Board to the burden of proving Clayton's violation of the standard of care.  Accordingly, we overrule Clayton's sixth assignment of error.

{¶ 49}  By Clayton's seventh assignment of error, she argues that the trial court erred in affirming the Board's decision to allow Klenke to testify as an expert witness.  She also argues that Klenke's participation as a witness biased the Board against her.  We disagree with both arguments.

{¶ 50} During the trial, Clayton objected to Klenke testifying as an expert witness because Klenke was a member of the Board when the Board initiated its investigation into the complaint regarding Clayton's care of Patient 1. Klenke's term as a Board member ended approximately two years prior to her testimony at Clayton's hearing. Primarily, Clayton asserted that Klenke's prior service on the Board created a conflict of interest. The hearing examiner overruled the objection after Klenke testified that she was not involved in or even aware of the investigation while a Board member. Like the trial court, we perceive no error in this ruling.

{¶ 51} After the close of the hearing, Klenke was reappointed to the Board. Klenke was not present at the Board meeting when Clayton's attorney addressed the Board or when the Board voted to adopt the hearing examiner's report and recommendation with modifications. The Board added to its record a statement that it did "not give[ ] any deferential regard, or heightened weight, to Ms. Klenke's testimony, and accepts that testimony only to the extent that it was incorporated in the Findings of Fact and Conclusions of Law made by the Hearing Examiner." Adjudication Order, at 2. Despite the Board's explicit assurances of impartiality, Clayton now argues that Klenke's participation in the matter biased the Board against her.

{¶ 52} A reviewing court presumes that the decision of an administrative agency is valid and was reached in a sound manner. *West Virginia v. Ohio Hazardous Waste Facility Approval Bd.*, 28 Ohio St.3d 83, 86 (1986); *accord McRae v. State Med. Bd.*, 10th Dist. No. 13AP-526, 2014-Ohio-667, ¶ 42 (" '[A] presumption of honesty and integrity on the part of an administrative body exists, absent a showing to the contrary.' "). To overcome this presumption, an appellant must show that an administrative agency member was biased, partial, or prejudiced to such a degree that the member adversely affected the agency's decision. *ATS Inst. of Technology v. Ohio Bd. of Nursing*, 10th Dist. No. 12AP-385, 2012-Ohio-6030, ¶ 32.

{¶ 53} Here, the Board members explicitly repudiated Clayton's supposition that Klenke unduly influenced the Board's decision. We reject Clayton's argument that the Board's statement actually proves the Board's bias. We think it more likely that the Board definitively declared its impartiality to preempt the very argument that Clayton now

asserts. In any event, Clayton has not established any facts to overcome the presumption of validity. Accordingly, we overrule Clayton's seventh assignment of error.

{¶ 54} For the foregoing reasons, we overrule all of Clayton's seven assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

CONNOR and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).