**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Clayton v. Ohio Bd. of Nursing,* **Slip Opinion No. 2016-Ohio-643.]**

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-643

CLAYTON, APPELLANT, *v.* OHIO BOARD OF NURSING, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Clayton v. Ohio Bd. of Nursing,* **Slip Opinion No. 2016-Ohio-643.]**

*Administrative procedure—Board of Nursing—Disciplinary proceedings—R.C. 119.09–Hearing examiner for the Board of Nursing has the discretion to limit or quash subpoenas requested during disciplinary proceedings.*

(No. 2014-1092—Submitted September 16, 2015—Decided February 23, 2016.)

APPEAL from the Court of Appeals for Franklin County,

No. 13AP-726, 2014-Ohio-2077.

SYLLABUS OF THE COURT

A hearing examiner for the Board of Nursing has the discretion to limit or quash subpoenas requested during disciplinary proceedings.

_____

**LANZINGER, J.**

{¶ 1} In this administrative appeal we are asked to determine whether hearing examiners appointed by the Ohio Board of Nursing have the authority to quash or limit subpoenas requested in anticipation of disciplinary hearings. More specifically, we must determine whether in the disciplinary proceedings against plaintiff-appellant, Beverly Clayton, the hearing examiner's decision to limit one of Clayton's subpoenas caused reversible error. We hold that hearing examiners for the Ohio Board of Nursing have discretion to quash or limit subpoenas under appropriate circumstances and that the hearing examiner's decision in this particular case did not cause reversible error.

## RELEVANT BACKGROUND

### Events of August 27 and 28, 2009

{¶ 2} Beverly Clayton was employed as a staff nurse in the intensive-care unit ("ICU") of Mercy Hospital Western Hills since March 2008. At the beginning of her 12-hour work shift on August 27, 2009, Clayton was assigned responsibility for the care of a patient whom we identify by the initials R.B. R.B. had just been admitted to the ICU from the emergency department, where he had begun treatment for respiratory distress and rapid heartbeat. He was 80 years old and had diagnoses including congestive heart failure, pulmonary edema, rapid atrial fibrillation, kidney failure, and pneumonia. With a do-not-resuscitate order in place, he and his family asked the hospital to treat his symptoms short of using mechanical ventilation.

{¶ 3} During the 12 hours that Clayton was responsible for his care, she administered medications to R.B. ordered by the physician pursuant to instructions entered into the computer by the pharmacy department. In addition to the fluids required for the intravenous administration of medications, Clayton gave R.B. over a liter of normal saline. She also reviewed R.B.'s nursing-home records, assessed his awareness of his condition and his familiarity with the safety devices in the ICU

2

room, including call lights and side rails. Every two hours Clayton assessed and recorded R.B.'s ability to cough and deep-breathe, his passive range of motion, the status of his call lights and bed rails and the bed's positioning and elevation. She regularly recorded R.B.'s vital signs, fluid input and output, and medications administered.

{¶ 4} Clayton did not, however, review the treatment plan and physician's orders provided for R.B. by Dr. Jamelle Bowers, the lead internal-medicine physician at the hospital. Those orders contained different medication instructions, orders to contact additional physicians for specialized pulmonary and cardiology consultations, instructions to lower and monitor R.B.'s heart rate, instructions to increase and closely monitor his urine output, and finally, a prohibition against administering normal saline to him due to his diagnoses.

{¶ 5} Throughout the night, R.B.'s heart rate remained elevated, and he had little to no urine output. Around 1:00 a.m., his blood pressure started a steady decline. By the end of Clayton's shift, R.B.'s condition had deteriorated significantly, and he died later in the morning of August 28, 2009. That same afternoon, Clayton was informed by her supervisor that there would be an investigation into R.B.'s decline and death and that she would be suspended without pay until the investigation was completed. During a follow-up meeting with her supervisor, Clayton gave notice that she was resigning from her position effective August 28, 2009.

### Administrative Disciplinary Action—Prehearing Litigation

{¶ 6} After its investigation, the board commenced a professional disciplinary action against Clayton for her alleged violations of R.C. Chapter 4723. Clayton was issued a notice of opportunity for a hearing on November 19, 2010. The board alleged that Clayton's failure to check the physician's orders for R.B., and to follow those orders, constituted a failure to practice in accordance with acceptable and prevailing standards of safe nursing care, subjecting her to discipline

under R.C. 4723.28(B)(19). Clayton requested a hearing, and hearings were ultimately held on November 9 and 10, 2011, and February 29, 2012.

{¶ 7} The primary issue during prehearing proceedings was the propriety of subpoena requests. In a number of separate motions, Clayton requested subpoenas for the personal appearance of over two dozen persons, including two or more unidentified individuals. She also requested subpoenas duces tecum seeking to obtain approximately seven different collections of documents, including all hospital records in any way associated with R.B., all pharmacy records and communications associated with R.B., the personal contact information and employment files of all hospital employees and supervisors who had any association with R.B.'s admission or treatment at the hospital, her own complete personnel file, copies of all information made available to the board during its investigation, the personnel files of all nurses who were working at the ICU at any point during Clayton's shift from August 27 to August 28, 2009, and finally, the complete medical charts of all patients who received treatment at the ICU at any point during her shift from August 27 to August 28, 2009.

{¶ 8} The board filed a "motion to limit subpoena request," arguing that the number of requests was excessive. The board also contended that the request for the complete medical charts of all ICU patients other than R.B. was unreasonable because it was excessive and would cause confidentiality problems.

{¶ 9} After receiving the subpoenas, nonparty Mercy Health also objected to the portion of Clayton's requests directed to Mercy Health's records custodian and other employees. The hospital argued that the medical records of other ICU patients were privileged and therefore protected from discovery. It also asserted that the information in the records was irrelevant and that producing them would impose a significant undue burden on the hospital.

{¶ 10} Two weeks after the board's motion to limit, Clayton withdrew a number of the requests for subpoenas, leaving a total of 14. However, Clayton

countered that hearing examiners for administrative proceedings have the absolute duty under R.C. 119.09 to issue subpoenas requested by parties and that the examiners have no discretion to limit or quash the subpoenas. She also asserted that other ICU patients' records were necessary to establish extenuating circumstances surrounding her ability to care for R.B.

{¶ 11} Although the hearing examiner denied the board's motion in large part, he granted the request to limit the subpoena duces tecum issued to Mercy Hospital's records custodian for the production of health records for patients other than R.B. in the ICU during Clayton's shift. The hearing examiner held that the medical records for the other patients in the ICU at that time were likely irrelevant, beyond the scope of the charge against Clayton, and outweighed by privacy and confidentiality protections. He also determined that the same information could be obtained through other subpoenaed witnesses.

{¶ 12} At her hearing, Clayton had been provided with R.B.'s full medical record, her own full personnel file, the resumes and work history of the ICU nurses who had been working with her that night, and some of the board's investigatory notes of her disciplinary investigation. Over a dozen witnesses were subpoenaed, but Clayton opted not to call the nursing supervisor or the two ICU nurses on shift duty with her as witnesses.

### Administrative Disciplinary Hearing

{¶ 13} During Clayton's administrative hearing, the examiner heard the testimony of seven witnesses: Clayton herself, Clayton's expert witness, the board's expert witness, two individuals who investigated Clayton for the board, Dr. Bowers, and Tina Forte, RN, who was the charge nurse in the ICU immediately prior to Clayton's shift. Several witnesses testified that when Clayton began her shift, R.B. had been admitted to the ICU mere minutes beforehand, Clayton did not receive a standard nurse's report about R.B., and the overall circumstances were chaotic. The witnesses also generally agreed that the circumstances of Clayton's

shift were particularly challenging and that she was overburdened by her many responsibilities, including the supervision of less experienced nurses.

{¶ 14} Witness testimony differed significantly regarding three critical questions: (1) why Clayton did not read Dr. Bowers's orders, (2) why Clayton administered normal saline to R.B., and (3) whether Clayton exercised appropriate judgment when she waited until approximately 4:00 a.m. to notify the on-call doctor regarding R.B.'s declining condition and his failure to respond to his medications.

{¶ 15} Regarding the physician's orders, Clayton testified that they were missing from R.B.'s chart, and she was too busy throughout her shift to search for them. Dr. Bowers testified that she very easily located her orders in R.B.'s chart when she came to the ICU to check on R.B. on the morning of August 28, 2009. According to the two investigators, Clayton had never claimed during the investigation that the orders were missing, and she instead admitted that she had never reviewed them.

{¶ 16} Clayton testified that R.B. had an IV drip of normal saline already going when he arrived from the emergency department and that she stopped the IV and did not resume using normal saline until instructed to do so around 4:00 a.m. by Dr. Chaudhry, who was the on-call doctor at that time. The hospital records did not contain an order for normal saline in the emergency department or any written order from Dr. Chaudhry for the administration of normal saline. In Clayton's 4:00 a.m. written entry in R.B.'s chart, she indicated that she had called Dr. Chaudhry and also administered 250 mL of saline to R.B.

{¶ 17} Both the board's expert witness and Dr. Bowers believed that instead of waiting until 4:00 a.m., Clayton should have notified a physician of R.B.'s condition at various points between 9:00 p.m. and 1:00 a.m. after his rapid pulse, respirations, and urine output did not respond to multiple rounds of medication. They also believed that the steady decline in R.B.'s blood pressure that started after

1:00 a.m. should have prompted Clayton to call a physician. Clayton and her expert witness believed that notification was necessary only after R.B.'s condition became unstable, which Clayton believed to have occurred at 4:00 a.m., when R.B. became unresponsive. Clayton's expert believed that R.B.'s condition became unstable at 3:00 a.m., when the most significant drop in blood pressure occurred.

### *Hearing Examiner's Recommendation*

{¶ 18} In his report and recommendation, the hearing examiner concluded that discipline was warranted.

{¶ 19} On the first of the three contested issues, Clayton's claimed inability to locate Dr. Bowers's orders in R.B.'s chart, the hearing examiner determined that the orders from Dr. Bower were included in the medical chart sent with R.B. to the ICU and that the orders remained in his chart the entire time at the ICU. The hearing examiner found that Clayton's claims to the contrary lacked credibility. On the second issue, whether Clayton's administration of normal saline was authorized, the hearing examiner found that 250 mL of the normal saline given to R.B. was verbally ordered by Dr. Chaudhry. The remaining saline fluids given were not authorized, and Clayton administered them contrary to the physician orders that she had failed to read. Finally, on the third issue, whether Clayton exercised proper judgment in waiting until 4:00 a.m. to contact a physician, the hearing examiner determined that the acceptable and prevailing standards for safe nursing care in Ohio required notification and consultation with a hospital physician by 10:16 p.m., when R.B.'s heart rate did not respond to medication, or at the latest by 2:00 a.m., when R.B.'s blood pressure dropped significantly.

{¶ 20} The hearing examiner concluded that Clayton's failure to review Dr. Bowers's orders, the resulting failure to implement those orders and comply with the saline prohibition, and the failure to timely recognize and provide notification of R.B.'s declining condition all demonstrated a failure to practice nursing in accordance with acceptable and prevailing standards of safe nursing care in Ohio.

These actions violated R.C. 4723.28(B)(16) and (19) as well as several regulatory standards for patient safety and nurse competency. The hearing examiner acknowledged the chaotic circumstances of Clayton's work shift, but determined that such circumstances would serve only to mitigate the discipline that would be appropriate for Clayton's violations and would not negate the violations themselves.

{¶ 21} Upon consideration of all applicable facts and circumstances, the hearing examiner recommended that the board suspend Clayton's nursing license indefinitely, but for a minimum of one year; restrict her ability to work in acute or critical nursing care for two years after reinstatement; and permanently restrict her ability to work in certain other areas of nursing. The hearing examiner also recommended certain requirements for reinstatement, which would be followed by a probationary term of three or more years.

{¶ 22} The board accepted the hearing examiner's findings of fact and conclusions of law, his recommendation that Clayton's license be suspended for at least one year, and certain probationary terms, but modified other probationary terms and eliminated any permanent practice restrictions.

### Appeals of Administrative Action

{¶ 23} Among Clayton's arguments to the Franklin County Court of Common Pleas was her assertion that the hearing examiner's decision denied her the opportunity to be heard in a meaningful manner by rendering her unable to prove the extent to which she was overburdened by her duty to assist the other ICU nurses with the other ICU patients.

{¶ 24} The trial court rejected this and other arguments in Clayton's appeal and affirmed the board's decision. The trial court noted that Clayton had subpoenaed— but did not call—those very same ICU nurses, who could have testified as to how the conditions in the ICU that night were so chaotic that Clayton was continually called away from her own duties. Because she failed to even

attempt to elicit the same evidence through firsthand-witness testimony, the trial court declined to give credence to Clayton's assertion that the medical evidence was crucial to her case. The trial court concluded that the hearing examiner's decision was not an abuse of discretion or contrary to law.

{¶ 25} Although the Tenth District Court of Appeals likewise rejected Clayton's argument regarding the subpoena duces tecum, it implied that the hearing examiner's decision to limit the subpoena may have been erroneous. The court noted that R.C. 119.09 provides that an agency holding an administrative hearing "shall" issue a subpoena upon the request of parties such as Clayton. 2015-Ohio-2077, ¶ 28. The appellate court suggested that this language is mandatory and without exceptions. But it held that Clayton was required to demonstrate prejudice to obtain a reversal based on an alleged violation of R.C. 119.09. Because Clayton did not call the ICU nurses to testify and because she could not demonstrate that their testimony would have been deficient, the appellate court held that Clayton failed to establish prejudice and affirmed the trial court's judgment.

{¶ 26} Clayton appealed to this court, and we initially declined jurisdiction over the case. 140 Ohio St.3d 1441, 2014-Ohio-4160, 16 N.E.3d 684. On reconsideration, we accepted the appeal on one proposition of law. 140 Ohio St.3d 1508, 2014-Ohio-5098, 19 N.E.3d 924. In that proposition of law, Clayton contends that a nurse subject to disciplinary proceedings has the right to the issuance of subpoenas for evidence that is purportedly material to the nurse's defense and that a hearing examiner's denial of this right is contrary to law, unconstitutional, and reversible error.

### LEGAL ANALYSIS

{¶ 27} Within Clayton's proposition of law are two main assertions. The first is that the decision to limit Clayton's subpoena request for ICU patient records was contrary to law because the hearing officer had no authority to do so under R.C. 119.09. The second assertion is that even assuming that the hearing examiner

had such authority, the ICU patient records were so crucial to Clayton's case that the limitation of her request was an abuse of discretion and a violation of her due-process right to present a defense.

{¶ 28} R.C. Chapter 119 applies to agencies like the Board of Nursing that have "the authority or responsibility of issuing, suspending, revoking, or canceling licenses." R.C. 119.01(A)(1). It lays out the procedures that must be followed by a state agency when creating rules that are within its statutory authority to create, as well as the general procedures to be followed when enforcing its rules and applicable statutes during an adjudication process. R.C. 119.02; R.C. 119.06 et seq.

{¶ 29} For parties in Clayton's position, an agency is required by R.C. 119.06 to provide the opportunity for a hearing prior to adjudication. The agency is empowered by R.C. 119.09 to appoint a hearing examiner to act in its place, and the hearing examiner, through the agency's authority, is charged with determining the admissibility of any evidence proffered at the hearing. Regarding the agency's and hearing examiner's subpoena powers, R.C. 119.09 provides:

> For the purpose of conducting any adjudication hearing required by sections 119.01 to 119[.]13 [of] the Revised Code, * * * the agency may, and *upon the request of any party * * * shall, issue a subpoena* for any witness or a subpoena duces tecum to compel the production of any books, records, or papers * * *.

(Emphasis added.) The procedure for serving subpoenas "shall be served and returned in the same manner as a subpoena in a criminal case," and the state is obligated to pay for the service of subpoenas and the fees for witnesses, including travel expenses, R.C. 119.09; R.C. 119.094. *See also* Crim.R. 17 (procedure for service of subpoenas).

{¶ 30} From the mandatory language of R.C. 119.09 that the agency "shall" issue subpoenas, Clayton infers that a hearing examiner has no authority, let alone the discretion, to limit or quash subpoenas. But whether an administrative agency might be empowered to limit or quash a subpoena is a separate question that is not resolved by reference to the agency's power or obligation to issue subpoenas.

{¶ 31} The Board of Nursing has the power under R.C. 4723.07 to promulgate any rules, including procedural rules, that would be necessary to carry out its functions. And the board has promulgated a rule, Ohio Adm.Code 4723-16-08, that purports to provide a hearing examiner with the discretion to limit or quash subpoenas in the manner done by the hearing examiner in this case. But irrespective of the board's general rulemaking power, a board cannot promulgate a rule that is beyond the powers granted to it by the legislature. *McFee v. Nursing Care Mgt. of Am., Inc.,* 126 Ohio St.3d 183, 2010-Ohio-2744, 931 N.E.2d 1069, ¶ 24. An administrative agency is able to promulgate rules governing its activities and procedure, but only if it has the statutory authority to do so and only if the promulgated rules do not conflict with any applicable statutes. *State ex rel. De Boe v. Indus. Comm.,* 161 Ohio St. 67, 117 N.E.2d 925 (1954), paragraph one of the syllabus.

{¶ 32} R.C. Chapter 119 does not mention the power of an agency to quash or limit subpoenas. Thus it does not expressly grant this power to administrative agencies. However, a power "may be fairly implied where it is reasonably related to the duties of the public agency." *State ex rel. Corrigan v. Seminatore,* 66 Ohio St.2d 459, 470, 423 N.E.2d 105 (1981).

{¶ 33} We hold that the ability to limit or quash subpoenas must necessarily be inferred from the power to issue subpoenas "[f]or the *purpose* of conducting any adjudication hearing." (Emphasis added.) R.C. 119.09. The express grant of power implies a grant of other powers reasonably necessary to make the express

power effective. *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 39.

{¶ 34} Having been granted the power to issue subpoenas, all administrative agencies must have the corollary power to quash subpoenas in licensure-related hearings. Hearings are a necessary incident to the agencies' licensure powers. *See State ex rel. Mayers v. Gray*, 114 Ohio St. 270, 275, 151 N.E. 125 (1926). Agencies must have at least some minimal authority to control those hearings, subject to a duty to maintain fairness and impartiality. Strict and technical rules of criminal or civil judicial hearings do not apply to their proceedings. *Id.*

{¶ 35} Without the ability to quash or limit subpoenas that seek the production of unreasonable, privileged, or irrelevant information or witness testimony, a hearing examiner would be powerless to control the procedure of the adjudication hearing pursuant to R.C. 119.09. Thus, the authority to quash or limit subpoenas flows from the authority to issue them in an adjudicative hearing.

{¶ 36} Accordingly, we hold that a hearing examiner has the discretion to limit or quash subpoenas requested during adjudication hearings for the purpose of conducting a fair and efficient hearing. As a result, we cannot say that the hearing examiner in this case lacked the discretion to rule on the board's motion or that the decision to limit Clayton's subpoena duces tecum for patient records was forbidden by R.C. 119.09.[1]

---

[1] We note that under R.C. 4723.29, a hearing examiner for the Board of Nursing has no choice but to refuse to issue a subpoena for a medical record if the attorney general and the executive director and president of the board determine, under certain criteria, that the request should not be approved. However, the record does not reflect that an official, coordinated response from the board and attorney general's office was ever completed pursuant to R.C. 4723.29, and instead the board and attorney general's office represented that they would proceed pursuant to the hearing examiner's decision. Thus because R.C. 4723.29 was not enforced by the board, our analysis does not incorporate any consideration of its mandatory provisions.

**{¶ 37}** The only remaining question is whether the hearing examiner's decision was so arbitrary that it constituted an abuse of discretion or denied Clayton her due-process right to the opportunity to be heard in a meaningful manner.

**{¶ 38}** Clayton does not assert that the missing evidence would justify her decision to perform nonessential tasks with R.B. instead of taking that time to perform essential tasks such as reading the doctor's orders for R.B. and notifying doctors of R.B.'s significantly deteriorating condition. And Clayton does not assert that the missing evidence would justify her decision to take the time to administer normal saline to R.B. instead of simply not doing so as directed in the doctor's orders. The hearing examiner's decision shows a careful weighing of Clayton's interest in a complete defense against the confidentiality interests of patients, the administrative interests of Mercy Hospital, and the potential relevance of the information to the central issue of Clayton's care for R.B. Regardless of whether we would have struck that balance differently, we cannot say that the hearing examiner's decision was so irrational that it was an abuse of discretion or so capricious that it violated Clayton's procedural due-process rights. We therefore reject Clayton's proposition of law.

CONCLUSION

**{¶ 39}** A hearing examiner for the Board of Nursing has the discretion to limit or quash subpoenas requested during disciplinary proceedings. In this case, the hearing examiner's decision to limit Clayton's subpoena duces tecum for the medical records of patients other than the patient whose care was at issue was not an abuse of discretion. We therefore affirm the judgment of the Tenth District Court of Appeals.

Judgment affirmed.

O'CONNOR, C.J., and FRENCH and O'NEILL, JJ., concur.

PFEIFER, O'DONNELL, and KENNEDY, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

{¶ 40} Was patient R.B.'s death the result of the failure of Beverly Clayton or a larger, systemic failure at Mercy Hospital Western Hills ("Mercy Hospital")? It is easy to blame the nurse: she made mistakes. But Clayton lost the opportunity at her hearing to demonstrate effectively that her own mistakes were the natural result of a failure of process at Mercy Hospital. I would hold that the hearing officer erred in quashing Clayton's subpoena for records of other patients in the intensive-care unit on the night of R.B.'s death and that that error was prejudicial. Accordingly, I dissent.

{¶ 41} The court below and the majority suggest that Clayton had other ways besides patient records to demonstrate that she was in the midst of a chaotic situation during the evening on which R.B. was admitted to the ICU. But why should she be limited to inferior evidence? The nurses working with her on the evening in question were inexperienced and needed Clayton's assistance. Clayton testified at her hearing that they had difficulty even starting IVs. Do the recollections of inexperienced co-workers, who may be called against their will to testify about their own incompetence over two years after the night in question, provide the same quality of evidence as medical records, which can describe with clinical detachment exactly what happened on the ICU floor that night? In the hearing, Clayton's expert witness, Terence Gallagher, described the difficulty of definitively detailing the exact events involved in Clayton's case without a written record:

> I believe that it was an absolutely insane night the entire night. However, without the other documentation that we requested, we don't have anything that says we had to run over here. There's another rapid response; here's another admission; here's another

admission; here's another admission. I believe that kind of thing went on that entire time.

    * * *

    I'm referring to Beverly having to run from room to room to room putting out fires because this person is having trouble doing this and that person is having trouble doing that, and/or the supervisor's on the phone sending me another admission when I have no nurses to accept transfer of care for that admission.

**{¶ 42}** Contemporaneous written records would present a full picture of the situation in the ICU; documentary evidence could demonstrate that Clayton's depiction of the ICU as unusually chaotic on that evening was not just common workplace bluster but was objectively true.

**{¶ 43}** Did Clayton not do enough for R.B. because she was asked to do too much for others? Clayton was called upon to administer medications, interact with the patient, monitor vital signs, and make the medical determination whether the patient needed to be seen by a physician. Multiply that by the seven or eight other patients that Clayton claims were in the ICU that evening and under her direct care or indirect care as the nurse in charge of the other nurses on that shift. Some of those patients certainly had a better chance for survival than R.B., who, along with his family, requested that no extraordinary means of resuscitation be employed. Did hospital priorities affect Clayton's care of R.B.? Wouldn't it be best for every patient if the nursing board could determine whether nurses were being systematically overextended?

**{¶ 44}** Beverly Clayton lost her license to perform her profession for at least a year. That is a crushing sanction, and the suspension carries a taint that will last forever. I would hold that a person fighting to maintain her right to practice her profession is entitled to fairly wide latitude in seeking documentary evidence to

support her defense, especially given the requirement in R.C. 119.09 that "the agency * * * upon the request of any party * * * shall[ ] issue * * *a subpoena duces tecum to compel the production of any * * * records." The records Clayton sought were directly related to her job performance on the night in question. The hearing officer was too restrictive in this case, and that prejudiced Clayton. I would remand the cause for a new hearing.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 45} Respectfully, I dissent. Because Ohio Adm.Code 4723-16-08(E), the Ohio Board of Nursing's rule authorizing a hearing examiner to quash a party's subpoena request, exceeds the board's statutorily delegated authority pursuant to R.C. 119.09, the rule is invalid. Moreover, since R.C. 119.06 mandates that "[n]o adjudication order shall be valid unless an opportunity for a hearing is afforded in accordance with sections 119.01 to 119.13 of the Revised Code," the quashing of the subpoena requests in violation of R.C. 119.09 renders the adjudication order invalid as a matter of law. Therefore, I would reverse the judgment of the Tenth District Court of Appeals and remand the matter to the board for further proceedings.

{¶ 46} The majority, by imposing its logic on a statutory scheme, has granted an administrative agency a new, unchecked power in contravention of the express statutory provisions of R.C. Chapter 119. The power the majority gives the hearing examiner is antithetical to the General Assembly's explicit language denying the board or its hearing examiner discretion when a party requests the issuance of a subpoena. Moreover, it is irreconcilable with more than a century of our precedent and erodes the Ohio Constitution, which vests the legislative power in the General Assembly. See Ohio Constitution, Article II, Section 1.

**{¶ 47}** An administrative agency has no authority beyond what is conferred by statute, and it cannot grant itself power without authorization from the General Assembly. *State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*, 88 Ohio St.3d 166, 171, 724 N.E.2d 411 (2000). Since 1917 this court has consistently limited the power of an administrative agency to those powers granted to it by statute:

In construing such grant of power, particularly administrative power through and by a legislative body, the rules are well settled that the intention of the grant of power, as well as the extent of the grant, must be clear; that in case of doubt that doubt is to be resolved, not in favor of the grant, but against it. It is one of the reserved powers that the legislative body no doubt had, but failed to delegate to the administrative board or body in question.

*State ex rel. A. Bentley & Sons Co. v. Pierce*, 96 Ohio St. 44, 47, 117 N.E. 6 (1917).

**{¶ 48}** While an agency has a certain amount of discretion in adopting rules to carry out the legislative objective, " 'an administrative rule cannot add or subtract from the legislative enactment.' " *Culbreath v. Golding Ents., L.L.C.,* 114 Ohio St.3d 357, 2007-Ohio-4278, 872 N.E.2d 284, ¶ 15, quoting *Amoco Oil Co. v. Petroleum Underground Storage Tank Release Comp. Bd.,* 89 Ohio St.3d 477, 484, 733 N.E.2d 592 (2000). A rule that is contrary to statute is invalid. *Hoffman v. State Med. Bd. of Ohio*, 113 Ohio St.3d 376, 2007-Ohio-2201, 865 N.E.2d 1259, ¶ 17.

**{¶ 49}** The board promulgated Ohio Adm.Code 4723-16-08(E), which authorizes the board to quash subpoenas. However, this rule runs contrary to R.C. 119.09, which states:

[T]he agency may require the attendance of such witnesses and the production of such books, records, and papers as it desires * * * and for that purpose the agency may, and *upon the request of any party* receiving notice of the hearing as required by section 119.07 of the Revised Code *shall*, issue a subpoena for any witness or a subpoena duces tecum to compel the production of any books, records, or papers, directed to the sheriff of the county where such witness resides or is found, which shall be served and returned in the same manner as a subpoena in a criminal case is served and returned.

(Emphasis added.)

{¶ 50} Moreover, the board's hearing examiner has no greater authority than the board. R.C. 119.09 (a "referee or examiner [appointed by the board] shall have the same powers and authority in conducting the hearing as is granted to the agency").

{¶ 51} When a statute is unambiguous, effect must be given to all of its language, without adding or deleting any words chosen by the General Assembly. Armstrong v. John R. Jurgensen Co., 136 Ohio St.3d 58, 2013-Ohio-2237, 990 N.E.2d 568, ¶ 12; State v. Vanzandt, 142 Ohio St.3d 223, 2015-Ohio-236, 28 N.E.3d 1267, ¶ 7. In statutory construction, the word "shall" is to be construed as mandatory. *State v. Golphin*, 81 Ohio St.3d 543, 545, 692 N.E.2d 608 (1998). Therefore, the board has no authority to promulgate an administrative rule granting itself or a hearing examiner the power to quash a party's subpoena request. "The validity of any administrative rule must be determined by reference to the statutes governing the agency. It is axiomatic that an administrative agency has no existence or authority beyond the statutes and may exercise only powers that are clearly

granted by the General Assembly." State ex rel. Gallon & Takacs Co., L.P.A. v. Conrad, 81 Ohio St.3d 1504, 691 N.E.2d 1063 (1998).

{¶ 52} Without citing a specific subdivision, the majority relies on R.C. 4723.07 as authorizing the board to promulgate rules for procedure. While R.C. 4723.07 grants the board authority to promulgate administrative rules, the statute limits the board's rulemaking authority to the following subjects: the governance of the board and its business, R.C. 4723.07(A); educational standards, R.C. 4723.07(B), (E), (F), (G), and (O); examination and licensure requirements, R.C. 4723.07(C), (D), (H), and (J); administration of medication, R.C. 4723.07(Q); universal and standard precautions for sanitation and sterilization, R.C. 4723.07(K); standards and procedures, quality assurance, and care arrangements for various nursing specialties, R.C. 4723.07(L), (M), and (N); and delineation of conduct that constitutes a failure to maintain professional boundaries with a patient, R.C. 4723.07(P). As written by the General Assembly, R.C. 4723.07 does not grant the board or its hearing examiner additional powers to regulate the issuance of a party's subpoena request pursuant to R.C. 119.09.

{¶ 53} While ignoring the express language of R.C. 119.09 that the board "shall" issue a subpoena at the request of a party, the majority also ignores other provisions in R.C. 119.09 that demonstrate that the General Assembly intentionally granted the board limited authority for hearings rather than the broad authority envisioned by the majority. For example, the General Assembly in R.C. 119.09 specifically delegates to the court of common pleas the authority to compel the attendance of witnesses through its contempt power. The board is authorized to take depositions, but the board's authority to rule on the admissibility of evidence is limited to "testimony and other evidence * * * *presented at the hearing*." (Emphasis added.) As a result, the board may not exclude evidence as inadmissible before the hearing begins.

**{¶ 54}** Lastly, while the majority correctly cites D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health for the proposition that an administrative agency has implied powers that are reasonably necessary to make express powers effective, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 39, its application in this case is mistaken. In this case, with regard to subpoenas requested by a party, the General Assembly expressly limits the board's and therefore the hearing examiner's authority to the *issuance* of such subpoenas. R.C. 119.09. Neither the board nor a hearing examiner has the authority to quash a subpoena request for any reason. Moreover, the majority's assertion that the General Assembly has given the board implied rulemaking powers may be true, but not in this instance. " '[T]he power of an administrative agency to administer a * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly,' by the legislature." (Emphasis deleted and ellipsis sic.) *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 289, 750 N.E.2d 130 (2001), quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). When it comes to the issuance of a subpoena at the request of a party, the General Assembly left no "gap" for the board to fill.

**{¶ 55}** While it may appear reasonable to the majority that a hearing examiner who has the ability to rule on the admissibility of evidence at a hearing should also have the power to quash a subpoena request, that was not the will or intention of the General Assembly. The judicial branch cannot impose its logic on a statute that clearly and unambiguously expresses the intention of the General Assembly. "[N]one of us is entitled to interpret a statutory scheme to make it reflect the logic that the justice or judge wants it to reflect. * * * [J]udicial policy preferences may not be substituted for valid legislative enactments." State v. South, 144 Ohio St.3d 295, 2015-Ohio-3930, 42 N.E.3d 734, ¶ 31 (O'Connor, C.J., concurring), citing Painter v. Graley, 70 Ohio St.3d 377, 385, 639 N.E.2d 51 (1994), and State v. Smorgala, 50 Ohio St.3d 222, 223, 553 N.E.2d 672 (1990). As

the "ultimate arbiter of public policy" State ex. rel. Cincinnati Enquirer v. Dupuis, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21, the General Assembly has declared that parties must be able to compel the issuance of subpoenas, unrestrained by the board, in order to gather evidence in defense of their licenses and livelihoods, leaving the final determination of admissibility of that evidence to the time of the hearing.

{¶ 56} Because the hearing examiner quashed the subpoena requests in violation of R.C. 119.09, the General Assembly commands that the adjudication order is invalid. "An appellate court's scope of review on issues of law is plenary * * *." *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 43. R.C. 119.06 mandates that "[n]o adjudication order shall be valid unless an opportunity for a hearing is afforded in accordance with sections 119.01 to 119.13 of the Revised Code." "Accordance" is defined as "agreement, accord" and is "now used chiefly in the phrase 'in accordance with.' " *Webster's Third New International Dictionary* 12 (1986). Another definition states, "To be *in accordance* is to be in conformity or compliance." (Italics sic.) Garner, *Garner's Dictionary of Legal Usage* 13 (3d Ed.2011). We also recently noted that "in accordance with" is akin to "pursuant to," which connotes rigid compliance. *State v. Niesen–Pennycuff*, 132 Ohio St.3d 416, 2012-Ohio-2730, 973 N.E.2d 221, ¶ 19.

{¶ 57} Moreover, the phrase "in accordance with" precedes the language "sections 119.01 to 119.13." R.C. 119.06. The plain language demonstrates that the General Assembly did not exclude the operation of any provision. Therefore, in order for the adjudication hearing order to be valid, full compliance with all the provisions contained in R.C. 119.01 through R.C. 119.13 was required. Since the quashing of the subpoena requests violated the mandatory "shall" language in R.C. 119.09, this renders the hearing not "in accordance with" R.C. 119.06 and as a matter of law, the adjudication order is invalid.

**{¶ 58}** Because Ohio Adm.Code 4723-16-08(E), the Ohio Board of Nursing's rule authorizing a hearing examiner to quash a party's subpoena request, exceeds the board's statutorily delegated authority pursuant to R.C. 119.09, the rule is invalid. Moreover, since R.C. 119.06 mandates that "[n]o adjudication order shall be valid unless an opportunity for a hearing is afforded in accordance with sections 119.01 to 119.13 of the Revised Code," the quashing of the subpoena requests in violation of R.C. 119.09 renders the adjudication order invalid as a matter of law. Therefore, I would reverse the judgment of the Tenth District Court of Appeals and remand the matter to the board for further proceedings.

**{¶ 59}** Accordingly, I respectfully dissent.

––––––––––––––

Sindell & Sindell, L.L.P., Steven A. Sindell, and Rachel Sindell, for appellant.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Samuel C. Peterson, Deputy Solicitor, and Henry G. Appel, Senior Assistant Attorney General, for appellee.

––––––––––––––